**LEASCO DATA PROCESSING EQUIP-
MENT CORPORATION, Leasco World
Trade Company (U.K.) Limited, Plain-
tiffs,**

v.

**Robert MAXWELL, M.C.M.P., et al.,
Defendants,**

v.

**Saul P. STEINBERG et al., Additional
parties with respect to the
counterclaim.**

**No. 69 Civ. 4790.**

United States District Court,
S. D. New York.

Sept. 16, 1970.

Willkie Farr & Gallagher, New York City, for plaintiffs.

Stroock & Stroock & Lavan, New York City, for defendant Isidore Kerman.

Shaw, Bernstein, Scheuer, Boyden & Sarnoff, New York City, for defendant Maxwell.

Kramer, Lowenstein, Nessen & Kamin, New York City, for defendants Isthmus Enterprises, Inc., Maxwell Scientific International, Inc., and MSI Publishers, Inc.

## OPINION

LASKER, District Judge.

In this action brought under Section 10(b) of the Securities Exchange Act of 1934, as amended, and Rule 10b–5 of the Securities and Exchange Commission promulgated thereunder, Isidore Kerman, a defendant, moves for an order pursuant to Rule 12(b) (3), F.R.Civ. Proc., dismissing the complaint on the ground that the court lacks personal jurisdiction over him. The motion is granted.

## I. FACTS

This case stems from the much-publicized collapse of a merger agreement reached in 1969 between plaintiff Leasco Data Processing Equipment Corporation ("Leasco")[1] and defendant Robert Maxwell, a British businessman and Member of Parliament who controlled an international publishing group built around Pergamon Press, Ltd. ("Pergamon"), a United Kingdom company. Early in 1969 Maxwell and Saul Steinberg, Chairman of the Board of Leasco, began discussing the possibility of engaging in joint business ventures in Europe. Eventually they came to consider the possibility of having Leasco, an aggressive conglomerate concern, acquire Pergamon. Negotiations took place both in England and in New York. Two rounds of discussion are particularly important with respect to this motion: the first occurred in England, over a four-day period in early June 1969, and the second in New York shortly thereafter, from about June 11 to June 17. The negotiations culminated in an agreement executed by Leasco and Maxwell on June 17 in New York, providing in relevant part for (a) the purchase by Leasco of Pergamon stock from Maxwell; (b) a tender offer by Leasco for the stock of Pergamon held by the public; and (c) the sale by Leasco of its own securities to Maxwell in partial payment for its purchase of Pergamon stock. Following the execution of the June 17th agreement, Leasco purchased on the open market over 5,000,000 shares of Pergamon stock, at a cost of approximately $22 million.

In August of 1969 the Leasco-Pergamon courtship turned sour. Leasco gave public notice of its refusal to go forward with the June 17th agreement, trading on the London stock exchange of Pergamon shares was suspended, the British Board of Trade instituted an investigation into the business affairs of Pergamon, and a struggle was waged for control of Pergamon's board of directors, which resulted in the ouster of the Maxwell leadership. This suit followed.

The pleadings are fraught with charges and countercharges of fraud. Leasco alleges that during the negotiations leading to the June 17th agreement it was misled by defendants as to the financial status of Pergamon and other of Maxwell's companies and also as to the commercial relations between Pergamon and the other companies. It further alleges that defendants deceived it into making the post-June 17 purchases of Pergamon shares on the open market, and in particular, that 600,000 of those shares were secretly sold by the defendants themselves. Maxwell, in turn, has

---

[1]. There is also a Leasco World Trade Company (U.K.) Limited, which is a British corporation whose principal office is in London. For the sake of simplicity, I have treated these related companies as one, and referred to them as "plaintiff" although they each bring this suit.

counterclaimed, charging that the Leasco companies and certain of their officers engaged in a conspiracy to defraud him, that their aim was to depress Pergamon's market price so that they could acquire control of Pergamon at a cost far below Pergamon's real value, and that, in pursuance of the conspiracy, they made false and misleading statements with regard to Leasco's financial status.

The movant Kerman's role in this battle between international business titans is, at most, peripheral. He is an English solicitor, the senior partner of a large London law firm which represents Pergamon and the Maxwell family interests, among numerous clients. During the period of the Leasco-Maxwell negotiations and until October 1969, he was a director of Pergamon. He is named as a co-conspirator in the complaint; and in plaintiff's answers to the defendants' interrogatories the acts which he is said to have performed in furtherance of the conspiracy consist of (1) making "numerous misrepresentations" to Leasco's representatives during the four days of negotiation in England in early June 1969, and (2) supplying N. M. Rothschild & Sons, an English banking firm, with a breakdown (presumably misleading) of the Maxwell interests' holdings of Pergamon shares and with information concerning the sale of Pergamon shares by the Maxwell family trust. It is further asserted, in affidavits submitted by Leasco's chairman Steinberg and other of its officers, that (1) in the New York negotiations culminating in the June 17th agreement "Maxwell represented that Kerman was involved in these transactions and that Maxwell was acting on his behalf also"; (2) during the four days of discussions in England in early June at which Kerman was present he gave Leasco's officers "reason to believe that he, Kerman, was aware of the previous meetings and communications which had taken place * * * and of the statements that had been made to plaintiffs by Maxwell and others * * * and appeared to be aware that Maxwell had acted and would continue to act with respect to these matters on Kerman's behalf as well"; (3) Kerman sent one of his law partners, Paul Di Biase, to New York to participate in the negotiations leading up to the June 17th agreement; (4) while Di Biase and Maxwell were conducting those negotiations, Kerman remained in London but received from them and sent to them "many communications" respecting the terms of the agreement. (This assertion is made upon information and belief and not from personal knowledge.) Plaintiffs' attorney further avers that "plaintiffs * * * have good reason to believe that Kerman was a trustee of Maxwell family trusts which sold some 600,000 shares of Pergamon to plaintiffs * * * [and that he] authorized Maxwell and Di Biase to act on his behalf in dealings with plaintiffs * * * in New York and elsewhere, * * *."

Mr. Kerman's version of his role, as reflected in his affidavits, is vastly different. He stresses, first of all, that the last time he was in New York was in 1967 on wholly unrelated business, and that he performed no acts whatsoever in New York or the United States with respect to the Leasco-Maxwell transactions. He denies that he conspired or combined with anyone to defraud plaintiffs, denies that he had any personal interest in the outcome of the negotiations, denies making or knowing of any misrepresentations made at the one meeting which he acknowledges attending during the four-day early June meetings in England, and states that he personally had nothing to do with the supplying to Rothschild of the information concerning the Maxwell interests' sale of Pergamon stock. Moreover, he declares that he never authorized Maxwell to act for him or to represent that he could act for him, that Di Biase went to New York in his own capacity as the partner generally responsible for handling Pergamon's commercial matters, and that neither Maxwell nor Di Biase communicated with him as to the terms

of the June 17th agreement. Rather, he avers that it was only after the agreement had been signed and Di Biase had returned to London that he learned of the result of the negotiations. Finally, he states that the only Maxwell settlements of which he is a trustee were nominal ones established in 1964 and dormant since then. He denies ever having been a trustee of any Maxwell family trust or having any connection with the sale of Pergamon shares to plaintiffs by such a trust.

## II. DISCUSSION

### A. *General Principles*

■■ In this motion to dismiss for lack of personal jurisdiction it is the plaintiff who shoulders the burden of proof, by a preponderance of the evidence. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189, 56 S. Ct. 780, 80 L.Ed. 1135 (1936). The mere averment of jurisdiction does not establish it. *Id.* Nor may conclusory, unsupported statements contained in the accompanying affidavits be relied upon to demonstrate jurisdiction. Newmark v. Abeel, 102 F.Supp. 993, 994 (S.D.N.Y.1952), Weinfeld, J.: "The statements * * * 'it is my understanding that [defendant] is doing business' and others of like tenor, are conclusory and unsupported by facts."

■■ Just as, in summary judgment motions, affidavits based on personal knowledge are to be credited over contradictory allegations based merely upon information and belief, Schoenbaum v. Firstbrook, 405 F.2d 200, 209 (2d Cir. 1968), so, too, facts adduced in opposition to jurisdictional allegations are considered more reliable than mere contentions offered in support of jurisdiction. When, as here, the party opposing the motion to dismiss for lack of personal jurisdiction contends that an issue of fact has been raised so as to warrant the taking of depositions,[2] the purported fac-

tual issue must be made apparent by something more than a "very strained reading" of the affidavits. H. L. Moore Drug Exchange, Inc. v. Smith, Kline & French Laboratories, 384 F.2d 97, 98 (2d Cir. 1967).

### B. *Jurisdiction under § 27 of the Securities Exchange Act of 1934*

Plaintiff Leasco contends that § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, confers personal jurisdiction upon defendant Kerman. Section 27 reads, in relevant part:

"The district courts of the United States * * * shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, * * *. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, * * * may be brought in * * * [the district wherein the violation occurred] * * * or in the district wherein the defendant * * * transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found."

As indicated previously, this action is based upon alleged violations of the anti-fraud provisions of the securities laws, including 15 U.S.C. § 78j(b), which is among the statutes and rules referred to in § 27. Kerman was served in London, England, pursuant to § 27. The gist of plaintiff's argument is that since § 27 authorizes the district courts to adjudicate this type of action, and since the action has been properly brought in this district (because some of the alleged violations took place here), it follows that the service of process effectuated pursuant to § 27 confers personal jurisdiction over Kerman.

■ The weakness in plaintiff's argument is that it glosses over the essential, constitutionally-decreed prerequisite

---

2. See the discussion *infra* as to plaintiff's request to be allowed to complete discovery before this motion is decided.

that the exercise of *in personam* jurisdiction comport with basic standards of due process. The existence of subject matter jurisdiction and proper venue is not enough, in itself, for *in personam* jurisdiction to result from the physical execution of service of process. In order to attain personal jurisdiction, the plaintiff must establish that the defendant has had certain minimal contacts with the jurisdiction "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" International Shoe Co. v. State of Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); Scanapico v. Richmond, Fredericksburg & Potomac Railroad Co. et al. (2d Cir.) Dkt. No. 34256 (Slip op. July 16, 1970); Ferraioli v. Cantor, 259 F. Supp. 842, 847 (S.D.N.Y.1966). The dominant criterion to be applied in determining whether the court can constitutionally exercise jurisdiction over an individual defendant not served within the state or district is to ascertain whether there was

"* * * some act by which the defendant purposefully avail[ed himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958).

Plaintiff argues that "even if" (sic) there is a "due process" constitutional test for personal jurisdiction, that test is satisfied here by the alleged conspiratorial relationship between Maxwell and Kerman. Plaintiff stresses that unless the anti-fraud provisions of § 10(b) are given extraterritorial effect so as to impose liability over absent conspirators, the securities laws could be evaded at will by clever swindlers who send their agents here to deceive the unsuspecting public. So far as it goes, this argument is valid—but it does not go far enough. For what it fails to recognize is that mere allegations of conspiracy, and even the presence of one co-conspirator within the jurisdiction, do not give jurisdiction over all the alleged co-conspirators.

H. L. Moore Drug Exchange, Inc. v. Smith, Kline & French Laboratories, *supra*, 384 F.2d at 98; Bertha Building Corp. v. National Theatres Corp., 248 F.2d 833, 836 (2d Cir. 1957), cert. den. 356 U.S. 936, 78 S.Ct. 777, 2 L.Ed.2d 811 (1958); Bankers Life & Casualty Co. v. Holland, 346 U.S. 379, 385, 74 S.Ct. 145, 98 L.Ed. 106 (1953), dissent of Frankfurter, J. To meet due process requirements there must be a factual showing of a conspiracy and also of a connection between the acts of the conspirator who was present in the jurisdiction and the conspirator who was absent.

In essence, the alleged propriety of subjecting Kerman to this court's jurisdiction is based on the assertions that he was a partner in conspiracy with Maxwell and that Maxwell's conduct here was undertaken at Kerman's request and for Kerman's benefit. These assertions rest in turn upon unsupported allegations that while in New York Maxwell represented that he was acting on Kerman's behalf; that in England certain Leasco officers somehow were given "reason to believe" that Kerman was aware of prior statements made by Maxwell in his behalf, and that by not objecting he ratified them; and finally, that (upon information and belief) Kerman communicated with Maxwell and Di Biase while they were in New York.

█ ██ Plaintiff offers neither explanation nor proof as to how or why it came to pass that Maxwell acted on behalf of his own lawyer, Kerman. To be sure, plaintiff declares that as a director of Pergamon Kerman had a direct personal interest in bailing Pergamon out of the allegedly precarious financial situation it was in at the time of the Leasco-Maxwell negotiations. Although this personal interest might explain why Kerman would conspire together with Maxwell, and even delegate to Maxwell the task of salvaging their common interests in Pergamon by means of misrepresentations, the "bland assertion" that Maxwell was Kerman's agent throughout the negotiations is not enough to establish an agency relationship, and not

enough to confer personal jurisdiction over Kerman. Unicon Management Corp. v. Koppers Co., 250 F.Supp. 850, 852 (S.D.N.Y.1966). As an analogy, to establish an agency relationship under the New York long-arm statute, § 302 CPLR, there must be specific facts that show that the principal had requested the agent to perform purposeful acts in New York for the principal's benefit. Orient Mid-East Lines, Inc. v. Albert E. Bowen, Inc., 297 F.Supp. 1149, 1152 (S.D.N.Y.1969). The same standard applies for due process purposes when the claimed basis for jurisdiction is § 27. See Hanson v. Denckla, *supra*, 357 U.S. at 253, 78 S.Ct. 1228.

■ The contention that Kerman and Maxwell were partners in conspiracy and that the latter's acts are binding on Kerman must similarly be rejected. In the face of Kerman's unqualified denials, statements as to the impressions which Leasco's officers received from Kerman (e. g., that he gave them "reason to believe" he knew of Maxwell's communications and "appeared to be aware" that these statements were made on his behalf) are insufficient and unacceptable. Newmark v. Abeel, *supra*, 102 F.Supp. at 994. In summary, plaintiff has not established even on a prima facie basis that Kerman deliberately engaged in activities here through Maxwell. There is no showing of the minimal contacts necessary in order to subject Kerman to this court's jurisdiction.

The cases which plaintiff cites to buttress its contention that *in personam* jurisdiction over Kerman exists here are all either inapposite or factually distinguishable. Hooper v. Mountain States Securities Corp., 282 F.2d 195 (5th Cir. 1960), cert. den. 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961), involved the issue of venue, as did Wharton v. Roth, 263 F.Supp. 922 (E.D.N.Y.1964). Levin v. Great Western Sugar Co., 274 F.Supp. 974 (D.N.J.1967), involved a question of subject matter jurisdiction, and there was no evidentiary question as to per-

sonal jurisdiction. The moving defendant was shown by affidavit to have had a sufficient connection with the forum state to make jurisdiction appropriate in S.E.C. v. Briggs, 234 F.Supp. 618 (N.D. Ohio 1964); In Dauphin Corp. v. Davis, 201 F.Supp. 470 (D.Del.1962), where the holding actually concerned venue though personal jurisdiction was discussed; and in S.E.C. v. VTR, Inc., 39 F.R.D. 19 (S.D.N.Y.1966). Thiele v. Shields, 131 F.Supp. 416 (S.D.N.Y. 1955), did review the sufficiency of defendants' connection with the sale of the securities in New York, but the issue was whether a claim had been stated, as opposed to whether there was personal jurisdiction.

C. *Jurisdiction under Rule 4(e) (1), F.R.Civ.P., and CPLR*

Plaintiff's second asserted basis for personal jurisdiction over Kerman derives from Rule 4(e) (1), F.R.Civ.P., which provides for service of process upon a party not an inhabitant of the forum state nor found within that state. The relevant portion of Rule 4(e) reads as follows:

"Whenever a statute or rule of court of the state in which the district court is held provides (1) for service of a summons, or of a notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the state * * *, service may * * * be made under the circumstances and in the manner prescribed in the statute or rule."

New York's long-arm statute, CPLR § 302, permits out-of-state service under certain circumstances. The service is effectuated pursuant to CPLR § 313. Plaintiff relies in particular on § 302(a) (3) (ii) CPLR, which reads, in relevant part:

"(a) *Acts which are the basis of jurisdiction.* As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any

nondomiciliary, * * * who in person or through an agent:

* * *

(3) commits a tortious act without the state causing injury to person or property within the state * * . *, if he * · * *

* * *

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; * * *."

Plaintiff encounters serious difficulties in its dependence upon § 302(a) (3) (ii) as justification for *in personam* jurisdiction over Kerman. Not only is there a dearth of facts to support the allegation that Kerman committed the tort of misrepresentation during the negotiations in England,[3] but the record contains no information upon which a finding may be made either as to the foreseeability of the consequences of Kerman's conduct or as to the extent to which he derives revenue from international commerce. Plaintiff recognizes that these are crucial elements under this section, and accordingly requests that decision on this motion be delayed until Kerman answers certain interrogatories that have already been propounded and "such additional interrogatories and depositions as are needed to fully develop the facts involved." This is tantamount to a concession that under the present state of the record there is no basis for extending the jurisdiction of this court to Kerman under § 302(a) (3) (ii).. It becomes necessary, therefore, to turn to the remaining question of whether this motion to dismiss should be held in abeyance while plaintiff engages in further discovery.

**D. *Postponement of Decision pending Completion of Discovery***

 It is clear that upon a motion to dismiss for lack of personal jurisdiction the court may permit either party to take depositions on factual issues raised by the motion. 4 Moore's Federal Practice ¶26.09[2.–4], pp. 1104–1105. However, discovery should not be allowed where no such issue of fact exists, and it is not error to dismiss a complaint and deny discovery where only a "very strained reading" of a party's affidavit raises a factual issue. H. L. Moore Drug Exchange, Inc. v. Smith, Kline & French Laboratories, 384 F.2d 97, 98 (2d Cir. 1967). See Richter v. Impulsora de Revolcadero S.A., 278 F. Supp. 169 (S.D.N.Y.1969); Jones v. Davega Stores Corp., 10 F.R.D. 434 (S.D.N.Y.1950), aff'd 186 F.2d 707 (2d Cir. 1951). In this case, as in Unicon Management Corp. v. Koppers Co., *supra*, 250 F.Supp. at 853, there have been no facts adduced in support of plaintiff's jurisdictional allegations. Instead, there are merely suppositions and conclusory allegations as to Kerman's contacts with the events in New York and elsewhere—all of which have been unequivocally denied by Kerman in his affidavits. This is not enough even to meet the Second Circuit's standard of "threshold jurisdiction" warranting further inquiry. *Id.* The fact that depositions have already been noticed does not alter this conclusion.

Further discovery would only impose an improper burden upon Kerman without any present showing that such discovery would demonstrate facts sufficient to constitute a basis for the exercise of personal jurisdiction. Schenin v. Micro Copper Corp., 272 F.Supp. 523, 524 (S.D.N.Y.1967).

3. If plaintiff sought to establish that Kerman's participation in the conspiracy and the misrepresentations consisted of his silent acquiescence in Maxwell's alleged deceptions, then plaintiff would still have to establish a relationship between the two such that Maxwell's "extensive and purposeful activity" could properly be found to have been undertaken on behalf of Kerman as well. See Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y. 2d 13, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970).

For the foregoing reasons, defendant Kerman's motion to dismiss the complaint as to him is granted.

It is so ordered.