**OXFORD FIRST CORPORATION and Lease/Auto Plan, Inc.**

v.

**PNC LIQUIDATING CORPORA-TION et al.**

Civ. A. No. 72–2364.

United States District Court,
E. D. Pennsylvania.

March 6, 1974.

Blank, Rome, Klaus & Comisky, Goncer M. Krestal, William E. Taylor, III, Gilbert Stein, Philadelphia, Pa., for plaintiffs.

Ruffo, Ferrari & McNeil, Thomas P. O'Donnell, San Jose, Cal., John T. Clary, Philadelphia, Pa., for St. Claire defendants.

## OPINON

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This is a securities fraud case in which the plaintiffs seek to recover damages because of alleged material misrepresentations made in a complex financial transaction which is detailed below.[1] Defendants William C. Duncan, Jr., Barbara Pabst Duncan, Donald G. Pabst and William D. Pabst (hereinafter referred to collectively as the St. Claire defendants) were served with process in California pursuant to section 27 of the 1934 Securities Act, 15 U.S.C. § 78aa. They have moved to dismiss the action for lack of *in personam* jurisdiction. Before addressing the motion, we must first set forth the transactions involved in detail. Since we are asked to rule here only on a motion to dismiss under 12(b) of the Federal Rules of Civil Procedure, we must consider the pleadings and affidavits in the light most favorable to the plaintiffs, who are the non-

---

[1]. This action alleges violations of section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b–5 of the General Rules and Regulations thereunder; and of section 17(a) of the Securities Act of 1933 (15 U.S.C. 77q(a)). It also charges defendants with breach of warranties and common law fraud and deceit. Jurisdiction of this Court is based on Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa) and Section 22(a) of the Securities Act of 1933 (15 U.S.C. § 77v(a)). The breach of warranty and common law fraud and deceit claims invoke the doctrine of pendent jurisdiction.

moving party.[2] On January 17, 1974, we entered an Order denying the St. Claire defendants' motion with a notation that this opinion would follow.

## II. *The Transactions Involved in the Case*

Based upon a reading of plaintiffs' complaint and affidavits, the transactions among the parties as respects this motion may be summarized as follows:

### A. *The Old Paragon—St. Claire Agreement*

On March 31, 1970, Paragon National Corporation (Old Paragon) and St. Claire Leasing Corporation and St. Claire Finance Corporation (hereinafter referred to collectively as St. Claire) agreed that Old Paragon would acquire all of the capital stock of St. Claire from the St. Claire defendants in exchange for stock in Old Paragon. Both St. Claire and Old Paragon were engaged in the auto leasing business. The Old Paragon—St. Claire agreement included representations and warranties by the St. Claire defendants that St. Claire's financial statements were prepared in accordance with generally accepted accounting principles and presented a true and complete picture of the enterprise. The St. Claire defendants agreed to indemnify Old Paragon for any damage due to misrepresentations, breach of warranty or breach of contract.

### B. *The Oxford First—Old Paragon Agreement*

In May of 1970 plaintiff Oxford First Corporation (Oxford First), a Philadelphia based concern which was engaged principally in the finance business, became interested in acquiring Old Paragon. On or about July 8, 1970, Oxford First entered into a tentative agreement with Old Paragon whereby substantially all of the assets of Old Paragon, including the St. Claire stock held by Old Paragon, were to be acquired by a new subsidiary of Oxford First called Paragon National Corporation (New Paragon)[3] in exchange for shares of Oxford First common stock payable to Old Paragon at closing under the Oxford First—Old Paragon Agreement.[4] It was understood that Old Paragon would liquidate and distribute the Oxford First shares to the Old Paragon shareholders. The Oxford First—Old Paragon Agreement

---

**2.** While we have found no case exactly on point that makes such an inference in a 12(b)(2) motion to dismiss for lack of personal jurisdiction, the case law in other 12(b) motions strongly supports our position. *See* Klapmeier v. Telecheck International, Inc., 315 F.Supp. 1360 (D.Minn.1970) (allegation in complaint that out of state residents were "controlling persons" within the meaning of 1933 Securities Act was presumed true in ruling on motions to dismiss for lack of personal jurisdiction and to quash extraterritorial service of process under Minnesota long-arm statute, since jurisdictional facts were so closely intertwined with the ultimate factual issue of statutory liability); Leasco Data Processing Equipment Corporation v. Maxwell, 468 F.2d 1326, 1330 (2d Cir. 1972) (on motion to dismiss for lack of subject matter jurisdiction, non-moving party entitled to every favorable inference, citing Steele v. Bulova Watch Co., 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 252 (1952)). As in *Klapmeier*, the jurisdictional facts in the instant case are so inextricably intertwined with the facts necessary to prove ultimate liability that it would be unfair to dismiss for lack of personal jurisdiction at this preliminary stage. Furthermore, if the non-moving party in a motion to dismiss for lack of subject matter jurisdiction is entitled to every favorable inference, *Leasco* and *Steele, supra,* then *a fortiori* he should be entitled to as much in a challenge to personal jurisdiction which can be waived and is less fundamental to the court's authority than subject matter jurisdiction. The burden of proof is at trial, however, and it remains for the plaintiff to establish the jurisdictional facts by a preponderance of the evidence. McNutt v. General Motors Acceptance Corporation, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

**3.** New Paragon is not a named party in the complaint, but Lease/Auto Plan, Inc., which became successor by merger to New Paragon, is a named plaintiff.

**4.** According to depositions also filed in the action, a revised version of this agreement was hammered out at a negotiating session on September 25, 1970 and drafted into final form on or about October 6, 1970.

provided that 10,000 of the 60,000 shares of Oxford First paid to Old Paragon would be held in escrow as collateral for any breach of warranty by Old Paragon, subject to a Collateral Security and Escrow Agreement.[5] The Oxford First—Old Paragon Agreement further provided for another 115,000 shares of Oxford First common stock to be held in escrow and delivered to Old Paragon or returned to Oxford First, depending upon the performance of New Paragon over 24 months ending June 30, 1972.[6] The Oxford First—Old Paragon Agreement included a number of representations and warranties by Old Paragon. Among them were the following: (1) that Old Paragon's financial statement fairly and accurately depicted Old Paragon's financial condition; [7] (2) that the St. Claire financial statements fairly and accurately represented St. Claire's financial condition; [8] (3) that the balances due on receivables, including the residual value of leased vehicles, were correctly reflected in the Old Paragon and St. Claire financial statements, and that adequate and proper allowance had been made for doubtful leases; and (4) that between June 30, 1970, and Novem-

ber 30, 1970, there were no adverse changes in Old Paragon's or St. Claire's financial conditions or operations, and that Old Paragon was not aware of any intention of any lending institution to terminate a significant relationship with Old Paragon. [9]

## C. The Old Paragon—St. Claire Settlement

The Old Paragon—St. Claire settlement and closing took place on July 13, 1970. The Old Paragon—St. Claire Agreement was amended on that day to reflect the fact that Oxford First had loaned Old Paragon in excess of $500,000 to enable Old Paragon to indemnify the St. Claire defendants for money they had advanced to keep St. Claire in a position so that it could be sold to Old Paragon. Oxford First advanced this money to Old Paragon to preserve Oxford First's own transaction with Old Paragon, since Oxford First's interest in Old Paragon was contingent on St. Claire's financial statements and St Claire's stock being included in Old Paragon's assets. It can reasonably be inferred from the facts averred in the affidavits [10] that at the time of settle-

---

5. These 10,000 shares were to be distributed to defendant Victor Goldsmith, an Old Paragon shareholder.

6. New Paragon allegedly lost money over this time period.

7. This financial statement was certified by defendant Ernst & Ernst.

8. These financial statements were also certified by defendant Ernst & Ernst.

9. In conjunction with the Oxford First-Old Paragon Agreement, defendant Leasco Corporation entered into an agreement with Oxford First and New Paragon to accept 28,677 redeemable shares of Series A Convertible Preferred stock of Oxford First in exchange for and full satisfaction of a Note for $650,000 due from Old Paragon. The Note was held by defendant Leasco Computer, Inc. (LCI), a wholly owned subsidiary of Leasco Corporation. It was issued by Old Paragon and originally convertible into common stock of Old Paragon.

10. We have received an affidavit from Robert J. Rosenstein, Executive Vice President of Oxford First, representing that he per-

sonally delivered Oxford First's checks to the St. Claire defendants at the St. Claire-Old Paragon closing and that the St. Claire defendants were fully aware at that time of the Oxford First interest in the St. Claire-Old Paragon transaction. In particular, Rosenstein stated in paragraphs 7–9 of his affidavit:

7. I personally delivered Oxford's checks for the required amounts [in excess of $500,000] to the closing settlement held by Old Paragon and the St. Claire stockholders on July 13, 1970. The St. Claire stockholders were fully aware at that time of the interest of Oxford in the St. Claire-Old Paragon acquisition and the eventual conclusion of the transaction wherein they would receive a distribution of Oxford common stock in lieu of the Old Paragon common stock initially given in exchange for the stock of the St. Claire Corporations. Indeed, the St. Claire-Old Paragon acquisition agreement was expressly amended on the day of closing to reflect the facts that the repayment to St. Claire Motor Company was to be made by Oxford and that the St. Claire Stockhold-

ment, the St. Claire defendants knew: (1) that Oxford First was repaying them; (2) that they were ultimately to receive Oxford First's stock instead of Old Paragon's stock in exchange for their St. Claire stock; and (3) that the St. Claire financial statements were given to and relied upon by Oxford First in its principal office in Philadelphia, Pennsylvania. Indeed, it is plain that Oxford First would not have made such arrangements to lend the St. Claire defendants money and accept St. Claire stock without reading and relying upon the St. Claire financial statements.

### D. The Oxford First—Old Paragon Settlement

On November 30, 1970, closing and settlement of the Oxford First—Old Paragon agreement was completed in Philadelphia. Sixty thousand shares of Oxford First stock were delivered to Old Paragon in exchange for the assets of Old Paragon, including all of the stock of St. Claire.[11] All the representations made by both St. Claire to Old Paragon,[12] and by Old Paragon to Oxford First survived the closing.

### III. Plaintiffs' Claims

In their complaint, Oxford First and Lease/Auto Plan, Inc. (the successor by merger to New Paragon) charge Old Paragon[13] and its shareholders[14] and the St. Claire defendants with: (1) breaches of warranties; (2) 10b–5 material misrepresentations; (3) violation of § 17(a) of the 1933 Securities Act; and (4) common law fraud and deceit. Oxford First also charges that Leasco Computer, Inc. (LCI) and Leasco Corporation knew of the fraudulent misrepresentations in the financial statements of St. Claire and of Old Paragon and that Leasco aided and abetted Old Paragon in this fraud. Finally, Oxford First charges that Ernst & Ernst (see notes 7 and 8, *supra*) knew or should have known about the fraudulent misrepresentations in the financial statements of St. Claire and Old Paragon.

ers were actually to receive shares of Oxford common stock, rather than Old Paragon common stock, in exchange for their stock in the St. Claire Corporation as a result of the two stage transaction.

8. The St. Claire Stockholders should have known, and I believe did in fact know, that the fraudulent misrepresentations contained in the St. Claire—Old Paragon acquisition agreement and in the financial statements of the St. Claire Corporations were being used by Old Paragon to induce the acquisition of Old Paragon's assets by Oxford, which acquisition the St. Claire Stockholders knew would be to their ultimate benefit.

9. The St. Claire-Old Paragon and Old Paragon-Oxford acquisition agreements, as well as the financial statements of the St. Claire Corporations and Old Paragon, all of which contained fraudulent misrepresentations, were delivered to Oxford's principal office in Philadelphia, Pennsylvania, with the knowledge that they would be relied upon by Oxford in Philadelphia, Pennsylvania, in agreeing to acquire the assets of Old Paragon.

11. Old Paragon became known as PNC Liquidating Corporation as of November 30, 1970. PNC Liquidating Corporation is the name used on the complaint, but we refer to this defendant as Old Paragon when speaking of its transactions before November 30, 1970. Defendants Victor Goldsmith, Lawrence M. Rosenthal, and Nelson Broms allegedly were "parents" of Old Paragon as that term is defined in Rule 12b–2 under the Securities Exchange Act of 1934 and in "control" as that term is defined in Section 20(a) of the 1934 Act (15 U.S.C. § 78t(a)).

12. According to the affidavits of the St. Claire defendants, paragraph 19 of the Old Paragon-St. Claire Agreement said it was not assignable, but plaintiffs' complaint alleges that the representations, warranties and indemnification provisions of the Old Paragon-St. Claire Agreement were transferred and assigned to Oxford First in the Oxford First-Old Paragon Agreement and settlement. (See paragraph 14 of complaint.) For the purposes of ruling on this motion, we credit the allegations of the non-moving party, the plaintiffs in this case.

13. Named as PNC Liquidating Corporation in the complaint.

14. Including Goldsmith, Rosenthal, Broms, Elemar Associates, William Pabst, Donald Pabst, William Duncan, Jr., Barbara Duncan and "John Doe."

## IV. *Discussion*

### A. *Introduction*

■ The St. Claire defendants challenge the *in personam* jurisdiction of this Court.[15] In support of their contention that personal jurisdiction does not lie, the St. Claire defendants have asserted two alternative claims. Their first argument is in counterpoint to plaintiffs' interpretation of the 1934 Exchange Act,[16] which provides that a combination of proper venue with extraterritorial service of process can fulfill the statutory requirements for *in personam* jurisdiction. The St. Claire defendants claim that there is no proper venue here and that the absence thereof defeats *in personam* jurisdiction in this case, since there is no other basis here for personal jurisdiction. In the alternative, the St. Claire defendants argue that, even if venue is proper, this Court still does not have *in personam* jurisdiction over them because they have not had the minimum contacts with this district necessary to meet the constitutional requirements of due process as embodied in International Shoe Company v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), which they contend to be applicable here. To support their conten-

15. The St. Claire defendants have not argued explicitly that even if this Court has *in personam* jurisdiction over them for the claims under the federal securities acts, we would lack personal jurisdiction over the state common law fraud and breach of contract counts (Counts III, IV, VII and VIII). Nor have they challenged the extraterritorial service of process under the 1934 Exchange Act with respect to the pendent claims. Yet since an argument may be implied from the St. Claire defendants' motion herein as to this Court's *in personam* pendent jurisdiction over these defendants concerning the non-federal causes of action alone, we feel constrained to address this issue in this footnote.

There is a split of authority on whether nationwide service of process under the securities acts may also be used as a basis for service and/or *in personam* jurisdiction in causes of action not enumerated in the federal statute but joined with the federal securities actions. *See* Behlke v. Metalmeccanica Plast, S.P.A., 365 F.Supp. 272, 276–277 (E. D.Mich.1973) (and cases cited therein); Getter v. Dickinson & Co., 366 F.Supp. 559, 566–567 (S.D.Iowa 1973). In our judgment, the arguments which support extraterritorial pendent personal jurisdictions are more persuasive. We note in particular considerations of judicial economy and convenience of the parties which underlie the pendent jurisdiction doctrine. *See* Schwartz v. Eaton, 264 F.2d 195 (2d Cir. 1959); Mills, "Pendent Jurisdiction and Extraterritorial Service Under the Federal Securities Laws," 70 Colum.L.Rev. 423 (1970). *But cf.* Ferguson, "Pendent Personal Jurisdiction in the Federal Courts," 11 Vill.L.Rev. 56 (1965). And we also find the statutory interpretation advanced by Mills in 70 Colum.L.Rev., *supra*, most convincing.

We perceive no additional hardship upon the St. Claire defendants here in expecting them to defend their actions against the state common law claims of fraud and violations of the federal securities laws. The common nucleus of operative facts necessary to prove both the federal and state causes of action is the same. In light of our view of the law and the facts in the instant case, we hold that this Court has *in personam* jurisdiction over the St. Claire defendants for the pendent as well as for the federal causes of action.

16. Section 27 provides:

The district courts of the United States . . . shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. *Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.*
15 U.S.C. § 78aa (emphasis added). Under section 22(a) of the 1933 Act, venue can be laid in the district where the "offer or sale took place, if the defendant participated therein." Where a single action alleges violations of both the 1933 Security Act and the 1934 Exchange Act, it has been held that the broader provisions of the 1934 Act apply. Stern v. Gobeloff, 332 F.Supp. 909 (D.Md.1971).

tions, these defendants assert by way of affidavit that their transactions with Old Paragon (*i. e.*, the St. Claire—Old Paragon Agreement and Settlement) were entirely separate and unrelated to Oxford First's transactions with Old Paragon.[17]

## B. *Venue*

Under the 1934 Act, venue is conferred "in the district wherein any act or transaction constituting the violation occurred." 15 U.S.C. § 78aa.[18] Venue will be sustained in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district, even if the defendant never has been physically present in that district. Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90, 106 (10th Cir.), cert. denied, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971), 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972); Texas Gulf Sulphur Co. v. Ritter, 371 F.2d 145, 148–149 (10th Cir. 1967). In the *Texas Gulf Sulphur* cases, defendant Fogarty released a false and fraudulent press statement that was printed in the Wall St. Journal and read and relied upon by plaintiff. In making the release, defendant intended that it be read and relied upon by people even outside the judicial district where it was issued, since the nature and function of a press release is to diffuse information. Although defendant Fogarty did not necessarily intend or even know that the press release would in fact be read and relied upon by the named plaintiffs in the district where the suit was brought, the court still found that venue was proper under section 27 of the 1934 Exchange Act.

The St. Claire defendants attempt to distinguish the *Texas Gulf Sulphur* cases on the theory that those cases involved transmittal of false information by a public press release, while the instant case alleges that the false information was communicated by a private and independent third party (Old Paragon) without the St. Claire defendants intending that it be so transmitted. However, in both the *Texas Gulf Sulphur* cases and in the instant case, the

<hr>

17. We have been submitted affidavits from each of the St. Claire defendants, alleging that they have never conducted business or done any act within the Eastern District of Pennsylvania. But compare Mr. Rosenstein's (Oxford First's) affidavit discussed on page 194 and in note 10, *supra*.

18. *Inter alia*, this phrase has been interpreted to reach defendants who were "in league" with other defendants who did an act within the judicial district where venue is sought and that constituted part of the alleged violation of the securities laws. However, to support the claim of venue on this conspiracy theory, there must be a factual showing of a conspiracy with a connection between the acts of the conspirator who was present in the jurisdiction and the conspirator who was absent. Leasco Data Processing Equipment Corporation v. Maxwell, 319 F.Supp. 1256, 1261 (S.D.N.Y.1970) (and cases cited therein); vacated on other grounds, 468 F.2d 1326 (2d Cir. 1972). Even viewing the pleadings and affidavits in a light most favorable to plaintiff, they do not amount to a conspiracy between the St. Claire defendants and the Old Paragon defendants. The St. Claire defendants do not appear to have ini-

tiated, or controlled what happened between Old Paragon and Oxford First; their principal concern was closing the St. Claire-Old Paragon Agreement. While an amendment to the St. Claire-Old Paragon Agreement, made on the closing day, provided that the St. Claire defendants would receive Oxford First's stock after the closing of the Oxford First-Old Paragon Agreement, allegedly this amendment also stipulated that the St. Claire-Old Paragon transaction would be closed whether or not Oxford First acquired Old Paragon's assets and that if the Oxford First-Old Paragon Agreement did not close, then the St. Claire defendants would retain the Old Paragon stock they received under the original St. Claire-Old Paragon Agreement. Moreover, the same amendment allegedly provided that either Old Paragon *or* Oxford First could repay the loan made by the St. Claire defendants. Thus, the St. Claire defendants apparently were not working with the Old Paragon defendants to achieve a common goal of closing the Oxford First-Old Paragon Agreement, but seemed to cooperate with Old Paragon only for the purpose of closing its own St. Claire-Old Paragon deal.

defendants knew or had reason to know their allegedly false information would be read and relied upon by potential plaintiffs. In fact, while defendant Fogarty had no reason to know who in fact would read and rely on his false statement, it can be inferred that the St. Claire defendants knew that Oxford First in Philadelphia was reading and relying on the information provided by the St. Claire defendants to Old Paragon.

The St. Claire defendants argue that even if they knew that their financial statements would be sent to and relied upon by Oxford First in Philadelphia, such knowledge will not sustain venue (and hence, on plaintiffs' theory, *in personam* jurisdiction under § 27), since it is not an "act within the forum district representing more than an immaterial part of the allegedly illegal event." Prettner v. Aston, 339 F.Supp. 273, 280 (D.Del.1972). But the "allegedly illegal event" in the instant case includes alleged material misrepresentations by the St. Claire defendants that the plaintiffs' claim injured them, and the St. Claire defendants' knowledge that such misrepresentations would be seen and used by Oxford First in Philadelphia is more than an immaterial part of such alleged fraud on the plaintiffs. Even if the St. Claire defendants did not control or intend to benefit by Old Paragon's deal with Oxford First, their (alleged) act of knowingly letting their false representations be sent to and relied on by Oxford First in Philadelphia was not an immaterial part of the "allegedly illegal event" which culminated in Philadelphia. Although the facts here are not as strong as those in *Stern v. Gobeloff* and *Texas Gulf Sulphur, supra,* on which plaintiffs rely, we believe that they are sufficient for us to conclude at this stage that the St. Claire defendants caused financial information (claimed to be false or misleading) to be sent into this judicial district, and that venue properly lies in this Court.

### C. *In Personam Jurisdiction*

1. *Are There Due Process Limitations Upon the Congressional Grant of (Nationwide) Extra-Territorial Service of Process Under the Securities Acts?*

■ The final argument made by the St. Claire defendants is that even if there is proper venue and service of process, this court would still lack *in personam* jurisdiction over them because they have not had the minimum contacts with this district necessary to meet the constitutional requirements of due process embodied in International Shoe Company v. State of Washington, 326 U.S. 310, 66 S. Ct. 154, 90 L.Ed. 95 (1945). This contention raises the vexatious question of whether there exist due process limitations upon the congressional grant of (nationwide) extraterritorial service under the securities acts[19] and under other acts.[20]

Most courts and commentators assume or find some federal due process limits on federal service of process. *See* Fraley v. Chesapeake and Ohio Ry., 397 F.2d 1 (3d Cir. 1968) (applies *International Shoe* test in FELA case); Lone Star Package Car Co. v. Balt. & Ohio R.R., 212 F.2d 147 (5th Cir. 1954) (and cases therein) (applies a basic fairness test to

19. Under the 1933, 1934 and 1939 Securities acts, process may be served in any district "of which the defendant is an inhabitant or wherever the defendant may be found." Securities Act of 1933 § 22(a), 15 U.S.C. § 77v(a)(1970); Securities Exchange Act of 1934 § 27, 15 U.S.C. § 78aa (1970); Trust Indenture Act of 1939 § 322(b), 15 U.S.C. § 77vvv (1970). The other three acts follow the same formula, with the additional choice of any district where the defendant "transacts business." Public Utility Holding Company Act of 1935 § 25, 15 U.S.C. § 79y (1970); Investment Company Act of 1940 § 44, 15 U.S.C. § 80a–43 (1970); Investment Advisers Act of 1940 § 214, 15 U.S.C. § 80b–14 (1970). *See also* L. Loss, Securities Regulation 2012 (2d ed. 1961).

20. *E. g.*, Sherman Act § 5, 15 U.S.C. § 5 (1970); Clayton Act §§ 12, 13 and 15, 15 U.S.C. §§ 22, 23 and 25 (1970); Bankruptcy Act § 77, 11 U.S.C. § 205(a) (1970).

federal law of process); Getter v. Dickinson & Co., 366 F.Supp. 559 (S.D.Iowa 1973) (found sufficient contacts with Iowa to justify *in personam* jurisdiction under due process test where financials prepared by defendants traveled to Iowa *and* where one of the defendant accountants made a trip to Iowa in connection with disputed financials); Leasco Data Processing Equipment Corp. v. Maxwell, 319 F.Supp. 1256 (S.D.N.Y.1970), vacated on other grounds, 468 F.2d 1326 (2d Cir. 1972) (applied minimum contacts test of due process to section 27 of 1934 Exchange Act); Dijulio v. Digicon, Inc., 325 F.Supp. 963 (D.Md.1971) (found defendant underwriter whose name was in prospectus used by other defendants in Maryland had met requirements of Section 22(a) of the 1933 Act and of due process); Abraham, "Constitutional Limits on Territorial Reach of Federal Process," 8 Vill.L.Rev. 520 (1963). Professor Abraham's article argues forcefully that the Fifth Amendment due process clause imposes some (though indefinite) constitutional limits on federal service of process. *Id.* at 531–536. Indeed, Professor Abraham concludes:

> The due process clause of the Fourteenth Amendment has been construed to protect an individual from inconvenient state litigation. There are indications that the courts consider at least part of the basis of this protection of the federal litigant to be the parallel provisions of the Fifth Amendment.

*Id.* at 537.

While we have found no cases actually holding that due process does not apply to a case like the one at bar where a federal service of process statute such as Section 27 of the 1934 Exchange Act is utilized in a federal suit, a few courts broach the possibility that the *International Shoe* standards of due process may not apply to such a situation. *See* Stern v. Gobeloff, 332 F.Supp. 909, 912–914 (D.Md.1971); First Flight Company v. National Car Loading Corporation, 209 F.Supp. 730, 736 (E.D. Tenn.1962). Both of these cases advanced the theory that the concept of personal jurisdiction is based primarily on the principle of territorial sovereignty and not on the notion of procedural fairness or substantial justice found in the due process doctrine. As Judge Wilson wrote in *First Flight, supra* at 736–737:

> One fundamental principle of the Anglo-American law of jurisdiction is that a sovereignty has personal jurisdiction over any defendant within its territorial limits, and that it may exercise that jurisdiction by any of its courts able to obtain service upon the defendant. This principle has long been applied to the states under the due process clause of the Fourteenth Amendment. In the case of corporations, the requirement of "presence" has given way to other standards such as consent to being sued within the state, "doing business" within the state, and finally to the having of such "minimum contacts with the state that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." The basic principle, however, has remained unchanged.

> What has frequently been overlooked is that this same basic principle has long been applied to the United States itself, so that the United States is deemed to have personal jurisdiction over any defendant within the United States. Because of this oversight, and by analogy to the application of the basic principle to the states, there is a line of cases apparently denying the validity of an exercise of personal jurisdiction by a federal court over a defendant present within the United States unless the defendant is also present (or "doing business," etc.) within the district in which the court is held. In other words, the restrictions of the Fourteenth Amendment upon state jurisdiction have been applied by these cases to federal jurisdiction. The anomaly here lies not only in overlooking the principle that the United States may

exercise personal jurisdiction over any defendant within the United States, but also in limiting federal action by a constitutional provision applicable only to state action.

There has been some limited judicial recognition of this anomaly. Thus in Jaftex Corporation v. Randolph Mills, Inc., [282 F.2d 508, 516 (2d Cir. 1960)] Judge Friendly, in a concurring opinion stated that it would be proper under the due process clause of the Fifth Amendment for a federal statute or rule to authorize the federal courts to formulate their own standards concerning the activities of a foreign corporation within a state which would subject it to the jurisdiction of a federal court within that state, but concluded that no such statute or rule has been adopted, and that federal courts therefore can exercise jurisdiction over a foreign corporation only when a local state statute has provided the method and standard for doing so. Judge Friendly thus appears to have recognized the anomaly of limiting federal jurisdiction by the Fourteenth Amendment, but to have overlooked the fact that the jurisdiction of the United States extends to any defendant present within the United States.

Similarly, in Lone Star Package Car Co. v. Baltimore & O. R. Co., [212 F. 2d 147 (5th Cir. 1954)] the Court stated that the Fourteenth Amendment has no application to federal jurisdiction, but held that, upon analogy to "the broad statements of policy" in recent Supreme Court cases dealing with state jurisdiction under the Fourteenth Amendment, "the question of whether they [federal court cases] are to be tried in one locality or another is now to be tested * * * simply by basic principles of fairness."

(footnotes omitted). In Stern v. Gobeloff, *supra,* Judge Murray referred to this portion of First Flight and went on to add that "when jurisdiction is based on a federal right, Congress can provide for service of process anywhere in the United States. *Stern, supra,* 332 F. Supp. at 912 [citing Mississippi Publishing Corporation v. Murphree, 326 U.S. 438, 66 S.Ct. 242, 90 L.Ed. 185 (1946)]. But, notwithstanding their exegesis of the basis for extraterritorial service both *First Flight* and *Stern* acknowledged that the facts in their cases meet any due process requirements that might apply. *Cf.* Robertson v. Railroad Labor Board, 268 U.S. 619, 622, 45 S.Ct. 621, 622, 69 L.Ed. 1119 (1925), where Justice Brandeis noted that Congress had the "power . . . to provide that the process of every District Court shall run into every part of the United States." Nevertheless, in construing the Transportation Act of 1920, the Court refused to permit extraterritorial service under that statute and intimated that congressional power to legislate nationwide service of process might be limited by elements of fairness, such as the hardship imposed on a defendant and whether the ends of justice require a defendant to be brought before a federal court in another state.

A few other authorities argue that *International Shoe* standards of due process do not necessarily apply to federal service of process statutes. Professors Richard H. Field and Paul J. Mishkin recommend worldwide service of process and argue that such a statute would not be unconstitutional. ALI, Study of the Division of Jurisdiction Between State and Federal Courts § 2374, and Commentary at 401–06 and Supporting Memorandum B at 437–441 (1969). However, they limit their recommendation with venue (§ 2372) and forum nonconveniens/transfer requirements (§ 2374(b)) and by giving a district court the discretion to dismiss an action or a party *if application of section 2374* would lead to undue burden on the distant parties and if the adverse effect of such disposition does not exceed $5,000 for any party. *Id.* § 2374(e) and commentary at 405–06. These other provisions in effect provide due process type limitations upon the ALI's sweeping service of process recommendation.

At least one other commentator argues that there is no reason to interpret the due process clause of either the Fifth or Fourteenth Amendment so as to hold unconstitutional the exercise of jurisdiction by a federal court of proper venue, based on the service of federal process on a proper agent of the defendant corporation, even though the corporation is not doing business in the state, provided it has sufficient contacts with some part of the United States. Green, "Federal Jurisdiction In Personam of Corporations and Due Process," 14 Vand.L.Rev. 967 (1961). The author concludes that if the provisions of Rule 4 of the Federal Rules of Civil Procedure are met, no significance should attach to the thin veil of state borders as far as the standards of due process are concerned. *Id.* at 986.

In this vein, a case can be made that the extension of federal jurisdiction to the extent of the so-called 100-mile bulge provided by the 1963 amendment of Rule 4(f) contradicts the existence of a due process limitation upon the congressional power over federal service of process. See also F.R.Civ.P. 25(a)(1) which authorizes nationwide federal process in connection with the substitution of a party in the event of the death of a party to a pending action. Even Professor Abraham, who is a strong advocate of a Fifth Amendment limitation on federal service of process, has noted:

> The Advisory Committee avoided this question [of whether federal service of process statutes are limited by Fifth Amendment due process] in connection with the "100-mile bulge" amendment. They pointed out that "In the light of present-day facilities for communication and travel, the territorial range of service allowed . . . can hardly work hardship upon the parties summoned. . . . The amendment is but a moderate ex-

tension of the territorial reach of Federal process. . . ." This is probably correct in most cases. Even if the Fifth Amendment places restrictions of fairness upon the territorial reach of federal process, the outer limits of fairness do not necessarily run along state borderlines.

8 Vill.L.Rev., *supra* at 535 (footnotes omitted). In this age of instant communication, due process cannot be measured by the number of state borderlines one must cross. It is certainly no farther from Beaumont in the Eastern District of Texas to El Paso in the Western District of Texas (*cf.* Rule 4(f) extending a federal court's process to the territorial limits of a state), than from Portland, Me. to Raleigh, N.C. across twelve state borderlines.

We reject the notion that there are no limitations upon extraterritorial service of process under federal statutes such as the securities acts; the existence of the Fifth Amendment would indicate otherwise. However, practical considerations emanating from the realities of contemporary litigation, especially in the securities and antitrust areas, are, for the reasons which follow, persuasive justification for upholding the view that any constitutional due process limitations upon a federal extraterritorial (nationwide) service of process statute must be broadly defined.

Anyone with experience in handling or managing litigation today in fields like securities and antitrust law knows that the place of trial is usually less important than the place of discovery.[21] The present case is no exception: a recent conference with counsel revealed that the discovery contemplated in what is only a medium-sized 10b–5 case is massive and will consume weeks at a time for many months. Moreover, even if the St. Claire defendants' motions were granted and they had to be sued in

---

21. While we have no statistics before us, experience tells us: (a) that the vast bulk of antitrust and securities cases, particularly the class actions, are settled, not tried; and (b) that even where there is a trial, the bulk of the litigation is represented by discovery proceedings.

California where they have their places of business or reside, most of the discovery in the case against them would still have to be done in this district or in New York.[22] The importance of the fact that the place of trial does not necessarily govern the place of discovery is that the alleged inconvenience or unfairness to a party extraterritorily summoned cannot be measured by the distance from his home to the place of the trial. To the extent that the discovery proceedings will in any event take place outside the state of defendant's residence or place of business, a claim of unfairness is significantly muted. In any event, it is counsel and not the parties who bear the burden of where discovery is conducted. And there is no reason to believe that there is a marked variation between the competency of counsel in various locales of the litigation, or that it should make a great deal of difference to the parties whether their local counsel handles the entire matter or is assisted by another firm.

There is also the matter of judicial economy. The work of this Court in managing this piece of litigation will be substantial, whether or not the St. Claire defendants are part of the suit before us. In terms of judicial economy, would it not be shamefully wasteful to require what is all part of a single litigation to proceed in two districts at once? Indeed, such a result would markedly impair the present litigation by shearing off an integral part thereof, as well as lead to duplication of effort by counsel and the courts. These problems are magnified in larger cases and in class action litigation where plaintiffs and defendants are far flung.

■ To respond to the far reaching consequences of certain types of litigation and to the practical considerations of judicial economy as described above, we believe that Congress should be able to authorize nationwide service of process under the "necessary and proper" power of Article III of the Constitution. When Congress decreed that certain types of causes were the subject of nationwide service, it may well have first made an implicit finding: (a) that the subject matter of such types of litigation had such an impact upon the national economy that parties to such litigation would, by virtue of having involved themselves in the regulated area, have to suffer the consequences of being sued in a distant place;[23] and/or (b) that the interests of judicial economy require that all facets of inevitably complex litigation arising under the given securities or antitrust statute be handled in one court, regardless of where a given defendant might be located. Congress also may have had in mind modern technology which make interstate communications less onerous.

We find a practical analogy of such Congressional intent in 28 U.S.C. § 1407 which creates the Judicial Panel on Multidistrict Litigation. Section 1407 provides for transfer and consolidation of *pre-trial* proceedings that will be for the convenience of parties and witnesses and promote the just and efficient conduct of such actions. While technically this provision does not expand the *in personam* jurisdiction of the transferee court, since it is supposed to limit the transfer to pre-trial proceedings, as a practical matter the transferee court often will decide questions of law and fact by means of a summary judgment. *See, e. g.,* In re Antibiotic Antitrust Actions, 333 F.Supp. 313 (S.D.N.Y.1971). Amended Rule 15 of the Panel, effective August 30, 1972, appears to formalize this type of action by the transferee

---

22. Conversely, even though the St. Claire defendants are now before this Court, a portion of the discovery is being done in California.

23. For instance, the transmission of false or misleading financial data relating to the pur-

chase or sale of a security could easily lead to a cause of action with anyone anywhere. Or consider anticompetitive business practices which can have an impact over a wide geographical area encompassing many states or regions.

court. Section (a) of that rule refers to "actions terminated in the transferee court by valid judgment, including but not limited to summary judgment, judgment of dismissal and judgment upon stipulation." 28 U.S.C. § 1407 (Supp. at 235, 1973). While there have been no constitutional challenges to the Multidistrict Panel and its rules, a party might someday contend that he has a due process right to refuse to submit to the *in personam* jurisdiction of a far distant transferee court. Meanwhile, the lack of challenge may reflect only a willingness on the part of those litigants subject to § 1407 to waive this due process right by consenting to the personal jurisdiction of the transferee court. Yet the same practical considerations that exist in the instant case also prevail in multidistrict litigation subject to 28 U.S.C. § 1407 and support the power of Congress to grant federal courts *in personam* jurisdiction without the strict constitutional limits of due process as enunciated in *International Shoe*.

Even though we are not persuaded that federal service of process statutes are constrained by constitutional due process strictures as defined by *International Shoe*, we believe that the federal extraterritorial service power is not unlimited,[24] and that some limitations thereon must be imposed. But we believe that it is better to include the traditional procedural due process notions as *a part* of a judicial fairness test, rather than impose the *International Shoe* mandate of due process on federal nationwide service of process statutes. While the underlying elements of procedural due process still should be applied, they should not outweigh all other elements of the fairness test, as they might if the only test for *in personam* jurisdiction were a strict constitutional one.

### 2. *Applying a Fairness Test*

■ The fairness test which we will apply includes consideration of the following matters: *First*, a court should determine the extent of the defendant's contacts with the place where the action was brought; *i. e.*, the *International Shoe* type criteria. *Second*, a court should weigh the inconvenience to the defendant of having to defend in a jurisdiction other than that of his residence or place of business. Subsidiary considerations here might include the nature and extent and interstate character of the defendant's business, the defendant's access to counsel, and the distance from the defendant of the place where the action was brought. *Third*, the matter of judicial economy should be evaluated. In particular, a court should gauge: (a) the potentiality and extent of any adverse impact upon the litigation that may result from having a part of the action sheared off; and (b) the prospect of duplication of effort by counsel and the courts in conducting two parts of the same lawsuit in different jurisdictions at the same time. As a barometer of the potential scope of the litigation in this regard, a court should also examine whether the case might involve a class action including far flung plaintiffs or defendants. *Fourth*, a court should consider the probable situs of the discovery proceedings in the case and the extent to which the discovery proceedings will, in any event, take place outside the state of defendant's residence or place of business, thus muting

---

24. A hybrid approach to the problem could be drawn from § 27 of the 1934 Exchange Act. That section includes a venue requirement which serves as a statutory limitation upon extraterritorial service, akin to the minimum contacts principle of *International Shoe*. Plaintiffs contend that such an approach, which would require venue plus *in personam* jurisdiction, furnishes the applica- ble test here. Since venue and *in personam* jurisdiction are historically and conceptually different notions (although both may be established by the same record facts), we believe that looking to venue as a limitation on nationwide service of process begs the difficult question of whether federal *in personam* jurisdiction alone is constrained by constitutional due process standards.

the significance of his claim that he is inconvenienced by the distant forum. *Fifth*, a court should examine the nature of the regulated activity in question and the extent of impact that defendant's activities have beyond the borders of his state of residence or business.

■ Applying these standards to the present case, we find the fairness balance to point strongly to upholding jurisdiction here. The unrefuted affidavit of Rosenstein, based upon personal knowledge, asserts the crucial facts [25] that are meant to show that the St. Claire defendants had the minimum contacts with this district necessary to meet our first criteria which includes *International Shoe* due process type factors. It can reasonably be inferred from the pleadings and affidavits that the St. Claire defendants knew that their financial statements would be sent to and used by Oxford First in Philadelphia and that they received benefits from the Oxford First—Old Paragon negotiations

and transaction in Philadelphia. As noted *supra*, the St. Claire—Old Paragon Agreement was amended at closing to reflect: (1) that repayment of a loan of over $500,000 was made indirectly by Oxford First to the St. Claire defendants, and (2) that the St. Claire defendants would receive Oxford First stock in exchange for their Old Paragon stock while Oxford First would receive the St. Claire stock, if and when the Oxford First—Old Paragon Agreement was closed. It is a close question whether these facts and the reasonable inferences therefrom would meet the *International Shoe* standards of due process, if that was the sole test.[26] However, in view of the foregoing discussion, we need not answer the question on *International Shoe* terms alone. On this record we find that there were sufficient contacts between the St. Claire defendants and this jurisdiction to support the first criterion of the multifaceted fairness test that justifies *in personam* jurisdiction here.

25. See note 10 and text on pages 194–195 *supra*.

26. The St. Claire defendants contend that *International Shoe* standards should be applied. To support their position, they rely on the district court opinion in Leasco Data Processing Equipment Corporation v. Maxwell, 319 F.Supp. 1256 (S.D.N.Y.1970). In *Leasco*, defendant Kerman, who was counsel for his co-defendant Maxwell, moved that the action against himself be dismissed for lack of personal jurisdiction. In granting his motion, the district court credited his affidavit, based on personal knowledge, and the facts adduced in opposition to jurisdictional allegations, over the contradictory but unsupported allegations of plaintiff, based merely upon "information and belief." *Leasco, supra,* 319 F.Supp. at 1260 (citing Schoenbaum v. Firstbrook, 405 F.2d 200, 209 (2d Cir. 1968)). But the district court's dismissal of Kerman was vacated by the Second Circuit. Leasco Data Processing Equipment Corporation v. Maxwell, 468 F.2d 1326 (2d Cir. 1972). Writing for the panel, Judge Friendly remanded with instructions to allow plaintiff to send Kerman interrogatories and· take depositions of other parties in order to build a better factual record for determining if Kerman had sufficient contacts to satisfy the due process requirements needed for *in personam* jurisdiction. We find that the defendant in *Leasco* had less contacts with the forum district than the St. Claire defendants have with this district in the instant case. In *Leasco*, the only evidence linking the defendant Kerman to the alleged fraudulent transaction was an affidavit based on "information and belief" refuted entirely by an affidavit of defendant based on his personal knowledge. Even on this weak showing, the Second Circuit would not let the district court dismiss for lack of personal jurisdiction until plaintiffs had more opportunity to demonstrate the defendant's contacts with the alleged fraud. In the instant case, on the other hand, an unrefuted affidavit of Mr. Rosenstein, based on his personal knowledge, states the crucial facts that are meant to show the minimum contacts necessary under *International Shoe* (See pages 194–195, and note 10, *supra*.), to the extent that test is applicable here. *But cf.* Getter v. Dickinson & Co., 366 F.Supp. 559 (S.D.Iowa 1973) (in dicta, court noted that due process would not be met, and court would therefore not have personal jurisdiction over defendant accountants by extraterritorial service of process under the 1934 Exchange Act, if their only contact with the forum district had been the fact that financials prepared by defendants came into and were used by plaintiff in the district where sued).

Turning to the other "fairness" criteria, we find that they tip the balance and further point to the upholding of personal jurisdiction here. The second criterion does inveigh against jurisdiction in view of the considerable distance between California and Pennsylvania. However, the countervailing considerations of the remaining criteria are far more weighty. In light of our third criterion of judicial economy, we note that there would be a seriously adverse impact upon this litigation if we were to shear off the St. Claire defendants from the instant suit; they are inextricably intertwined with the balance of the case, since Oxford First's 10b–5 claim with respect to its acquisition of Old Paragon subsumes the St. Claire data. Furthermore, a California district judge would have to exert substantial duplicative efforts if the suit against the St. Claire defendants had to be brought there. The facts that the bulk of the discovery proceedings will be conducted in Philadelphia and New York regardless of where the St. Claire defendants are sued means that our fourth criterion also militates against the St. Claire defendants and advances the plaintiffs' cause of *in personam* jurisdiction. The fifth aspect of our "fairness" test is not important here. That criterion would be more likely to be significant if the statute in question was one of the antitrust laws, or if the securities which were the subject of the 10(b) action had been disseminated to the public at large.

In sum, we find that the extraterritorial service of process here meets what we consider to be the truly applicable limitation: that of the fairness test. Since it is not unfair under this test to subject the St. Claire defendants to the extraterritorial process of this Court, and since venue also lies in this district, we have by appropriate Order upheld the service of process and denied the St. Claire defendants' motion to dismiss for want of *in personam* jurisdiction.[27]

27. The Order denying the St. Claire defendants' motion was entered on January 17, 1974.