**GREAT WESTERN UNITED CORPORATION, Plaintiff,**

v.

**Wayne L. KIDWELL, Attorney General of Idaho, Tom D. McEldowney, Director of the Idaho Department of Finance, Louis J. Lefkowitz, Attorney General of New York, Francis B. Burch, Attorney General of Maryland, and Norman Polovoy, Commissioner of Securities, Maryland Division of Securities, Defendants.**

**Civ. A. No. CA-3-77-0405-D.**

United States District Court,
N. D. Texas,
Dallas Division.

Sept. 2, 1977.

Ivan Irwin, Jr., A. B. Conant, Jr., James V. Grevelle, Shank, Irwin, Conant, Williamson & Grevelle, Dallas, Tex., Manuel F. Cohen, Michael R. Klein, Robert B. McCaw, A. Stephen Hut, Jr., Patricia D. Douglass, Cornelius J. Golden, Jr., Wilmer, Cutler & Pickering, Washington, D. C., James Wm. Moore, New Haven, Conn., for plaintiff.

Dickee Howard Goodman, Asst. Atty. Gen. State of Md., Baltimore, Md., for Burch and Polovoy.

Orestes J. Mihaly, Asst. Atty. Gen. in Charge, Bureau of Security, Louis J. Lefkowitz, Atty. Gen., pro se, New York City, Eugene D. Berman, Sp. Deputy Atty. Gen., Amy Juvilen, Asst. Atty. Gen., William S. Dugan, Deputy Asst. Atty. Gen., for Atty. Gen., State of N. Y.

Wayne L. Kidwell, Atty. Gen. of Idaho, Boise, Idaho, by Peter E. Heiser, Jr., Chief Deputy Atty. Gen., and James P. Kaufman, Asst. Atty. Gen., for Kidwell and McEldowney; Ellis McKay, Los Angeles, Cal., William H. Steinbrink, Robert A. Profusek, Cleveland, Ohio, Special Counsel.

## MEMORANDUM OPINION

ROBERT M. HILL, District Judge.

In this case plaintiff challenges the constitutionality of the statutes of the states of Idaho, New York and Maryland which seek to regulate tender offers when the subject of the tender (called the target company) has one of various nexus with the states. These are commonly called "takeover" statutes. Plaintiff contends the takeover statutes are preempted by the Williams Act, the federal statute which controls tender offers, and are also violative of the Commerce Clause of the United States Constitution. For the reasons set forth below, the court does not reach the merits of plaintiff's case against New York and Maryland, but finds that the takeover statute of the State of Idaho is preempted and violates the Constitution.

### I. Facts

Great Western United Corporation (Great Western) is a publicly owned Delaware corporation with its principal executive offices located in Dallas, Texas. The principal officers, all directors, and the controlling shareholders of Great Western—W. Herbert Hunt and Nelson Bunker Hunt—reside in Dallas. Great Western's stock is listed on the New York Stock Exchange and the Pacific Stock Exchange.

Sunshine Mining Company (Sunshine) is a publicly owned corporation organized under the laws of the State of Washington. The corporate headquarters, employing about fifteen people in corporate functions, is located in Idaho. Sunshine also owns mining and milling operations in Idaho which constitute over fifty percent of its corporate assets. Sunshine wholly owns its subsidiary, Anchor Post Products, Inc., of Delaware (Anchor Post), which in turn owns

subsidiaries incorporated in Florida, Texas,[1] Arkansas, and California. Anchor Post's manufacturing facilities are based in Maryland. Sunshine further has significant business activities in New York which make application of the New York takeover law arguable. Sunshine's shareholders are fairly well distributed across the United States.[2] At least 489 individual shareholders of Sunshine reside in Texas, and this figure does not include those shares held in street name.

Hecla Mining Company (Hecla) and Silver Dollar Mining Company (Silver Dollar) have non-operating interests in the Sunshine mine in Idaho. In December, 1976, Hecla and Silver Dollar underwrote a proxy fight to oust the present management of Sunshine. In February, 1977, Great Western representatives met with Hecla and Silver Dollar to discuss Great Western's interest in purchasing shares of Sunshine. On March 18, 1977, Great Western announced its agreement to purchase a total of 335,070 shares of Sunshine from Hecla and Silver Dollar. This purchase represents about 6% of Sunshine's outstanding shares. Great Western also agreed that if it were successful in gaining control of Sunshine, it would reimburse Hecla and Silver Dollar for their proxy fight expenses up to $200,000.

On March 21, 1977, Great Western filed a Schedule 13D Statement with the Securities and Exchange Commission pursuant to the Williams Act Amendments to the Securities Exchange Act of 1934, 15 U.S.C. §§ 78m(b)–(e), 78m(d)–(f) (1970). This same day Great Western publicly announced its intention to make a tender offer for 2,000,000 additional shares of Sunshine (approximately 35% of Sunshine's outstanding shares) at $15.75 per share.[3]

Also on March 21, Great Western contacted through its attorneys the three states whose state officials are named defendants in this lawsuit: Idaho, New York and Maryland. Great Western had evidently concluded that Idaho would certainly assert jurisdiction under its state takeover law but that New York and Maryland might be persuaded not to do so. It accordingly filed an application for registration under the Idaho takeover law and tried to draw indications from the Attorney General of New York and Commissioner of Securities of Maryland that they would not assert jurisdiction.

On March 25, 1977, Great Western received a telecopied letter from the Deputy Administrator of Securities of the Idaho Department of Finance, Melvin J. Baptie, indicating that he found Great Western's disclosures inadequate and that the twenty day time period for a hearing, provided by the Idaho takeover statute, Idaho Code § 30–1503(5), would not start to run until a complete statement was received, completeness to be determined by the Idaho Department of Finance.[4] Tom McEldowney, the Idaho Director of Finance, simultaneously entered an administrative order delaying the date of Great Western's tender offer.

In New York and Maryland, Great Western was faring little better. Great Western's counsel in New York were advised by the office of the Attorney General that New York was "leaning" toward asserting jurisdiction over the tender offer under its takeover law. In Maryland, counsel for

1. Property in Texas includes a manufacturing plant and a warehouse.

2. Plaintiff's Exhibit M 1.

3. This was Great Western's "unfriendly" offer. The Sunshine board of directors had the day before refused, under the time constraints placed upon it, to recommend to the shareholders Great Western's "friendly offer," a tender offer at $16.75 per share.

4. Although Baptie's demands for information considerably exceeded his earlier indications to Great Western that the Schedule 13D informa-

tion would more or less suffice, there is absolutely no reason to imply any bad faith on Baptie's part. This case presented the first filing under the Idaho takeover law, TRO tr. at 24, and some inconsistency and scrupulousness in administering the statute were predictable. The court specifically finds that Baptie did not write the letter of comment with assistance from or solicitude for Sunshine. Great Western never called Baptie back after receipt of the letter to see if any of his comments were negotiable.

Great Western were informed that Maryland would not comment on the applicability of its takeover laws without a hearing.

On March 28, 1977, because of uncertainty as to when, if ever, the tender offer might go forward, Great Western filed this suit in the Northern District of Texas, Dallas Division, for declaratory and injunctive relief against the state officials of Idaho, New York and Maryland from enforcing the takeover laws of their respective states. Great Western urges in its suit that the state takeover laws violate the Commerce Clause of the United States Constitution and are preempted by the Williams Act.

Besides denying liability on the merits, defendants raised a panoply of defenses in avoidance of Great Western's suit. In their answer, they contended that Great Western lacked standing to bring this action, that the court lacked subject matter jurisdiction and personal jurisdiction over the defendants, that defendants are immune from suit under the doctrine of sovereign immunity, that venue is improper in this district and that service of process is insufficient.

On April 8, 1977, the court held a hearing on jurisdiction and venue. On April 21, 1977, the court entered unpublished findings of fact and conclusions of law holding that Maryland should be dismissed because Great Western had no dispute with Maryland and therefore lacked standing to sue the State. The court also held that jurisdiction and venue existed against the States of Idaho and New York under the Securities Exchange Act of 1934, 15 U.S.C. § 78aa.

Thereafter, the State of New York attempted to take an uncertified appeal to the United States Court of Appeals for the Fifth Circuit which was dismissed on May 16, 1977. On May 23, 1977, a bench trial was held on the merits against New York and Idaho.

The court is of the opinion that Great Western's suit against the State of New York should be dismissed for mootness because New York no longer seeks to enforce its takeover statute against Great Western. The court is further of the opinion that jurisdiction, venue and service are proper against the State of Idaho and that the Idaho takeover statute violates the Commerce Clause, is preempted by the Williams Act and should be enjoined from enforcement. The court's rationale on the issues raised at the jurisdiction and venue hearing and at the merits hearing follows.

## II. Standing

The defendants first argue that Great Western lacks standing to bring this suit against them. For the reasons set forth below, the court concludes that Great Western lacks standing against the State of Maryland but has standing against the States of Idaho and New York.

The concept of standing is based on the Article III requirement of the United States Constitution that restricts federal judicial power to "cases and controversies." Through case law, standing has evolved into a rule of judicial self-restraint. *Barrows v. Jackson*, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).

As articulated by the United States Supreme Court, Great Western must meet two standing requirements. First, Great Western must prove an injury in fact, a concrete interest in the outcome of the suit, sufficient to render the matter a case or controversy subject to a federal court's Article III jurisdiction. Second, Great Western must be a proper proponent of the legal rights it seeks to enforce and within the "zone of interest" sought to be protected. *Singleton v. Wulff*, 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826, 832 (1976); *Data Processing Service Organizations v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). These will be discussed in reverse order.

### A. The "Zone of Interest" Test

In order to meet standing requirements, Great Western must first show that the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. *Data Processing Service Organiza-*

*tions v. Camp, supra.* The court is of the opinion that tender offerors are within the zone of interests protected by the Williams Act and that *Piper v. Chris-Craft Industries,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), does not compel a contrary result.

There is no question that the raison d'etre of the Williams Act is protection of shareholders. See *Piper v. Chris-Craft,* 430 U.S. at 26–29, 97 S.Ct. at 942–943, 51 L.Ed.2d at 144–145. But in implementing this policy, Congress placed special emphasis on even-handedness in the treatment of the target's management and the tender offeror. *Id.* at 29–33, 97 S.Ct. at 943–5, 51 L.Ed.2d at 146–7. Senator Williams himself stated:

> This measure is not aimed at obstructing legitimate takeover bids. In some instances, a change in management will prove a welcome boon for shareholder and employee, and in a few severe situations it may be necessary if the company is to survive.
>
> I have taken extreme care with this legislation to balance the scales equally to protect the corporation, management, and shareholders without unduly impeding cash takeover bids. Every effort has been made to avoid tipping the balance of regulatory burden in favor of management or in favor of the offeror.

113 Cong.Rec. 854 (1967).

This Congressional policy of even-handedness between management and offeror is sufficient to satisfy the zone of interest test of *Data Processing.*

Furthermore, while the Williams Act was created to protect shareholders from unscrupulous tender offerors, the legislation attempts to harness the tender offer as a pugilistic device for maximally advancing the interests of the shareholders. If Congress intended to encourage management and offerors to thrash it out for the benefit of the shareholders, it would be strange to deny the combatants any implicit interest in the procedures to be followed.

Although *Piper v. Chris-Craft* contains some broad statements to the effect that tender offerors were not intended beneficiaries of the Williams Act, the Court was at all times speaking in regard to interests in monetary damages under the Williams Act. The court ultimately concluded that implying a cause of action under the Williams Act for damages on behalf of the tender offeror would injure the very class for which the legislation was enacted. Damages against the target are damages against the shareholders. The Court specifically withheld judgment on the tender offeror's standing to sue for relief other than damages. 430 U.S. at 430–432, 97 S.Ct. at 949, 51 L.Ed.2d at 153 n. 28. This court is therefore free to hold that the Congressional policy of even-handedness is probative of its intent to grant standing to tender offerors and target management for declaratory and injunctive relief under the Williams Act. Great Western is within the zone of interest sought to be protected by the rights it asserts.

### B. The "Injury in Fact" Test

Great Western must also meet the second standing requirement by showing that it has a sufficient interest in the case for its dispute to qualify as a case or controversy. Put another way, Great Western must show that it actually suffers an injury due to defendants' acts challenged in this suit.

■ Great Western pled in its complaint that the various takeover statutes have a "chilling effect" upon the rights of tender offerors throughout the country. Yet the mere existence of defendants' takeover laws does not lend the degree of concreteness constitutionally required of a case or controversy. It is incumbent upon Great Western to show some indication of the intentions of Idaho, New York and Maryland to enforce these statutes to its detriment.[5] Through overtures to the three de-

---

**5.** *See, e. g., California v. LaRue,* 409 U.S. 109, 112, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972) (the litigants stipulated that the California Department of Alcoholic Beverage Control intended to take disciplinary action against appellee liquor licensees who offer sexual live entertainment in violation of state rules). The injury to one seeking a declaratory judgment against an al-

fendants before the institution of this suit, Great Western evoked the threat of enforcement with varying degrees of success.

### 1. Standing as to Idaho

■ There is no question that a case or controversy exists vis-a-vis Idaho officials. Baptie's detailed letter of comment, pointing up many shortcomings of Great Western's application under the Idaho law, and McEldowney's order, asserting jurisdiction over the proposed tender offer under the Idaho law and enjoining the tender offer from proceeding, constitute clear acts of present enforcement of the challenged law. Idaho officials have coerced compliance with their state takeover act. Great Western has produced testimony of John S. Guest, an investment banker, that delays under all of these state acts inflict an economic cost on the tender offeror by tying up his capital and significantly jeopardize the success of an offer. Under these facts, in the case of Idaho, Great Western has shown a sufficiently concrete injury stemming from the enforcement of an allegedly unconstitutional state law.

### 2. Standing as to New York

■ The actions of the New York officials are more problematical. The court heard testimony at the hearing on jurisdiction and venue from Milton Strom, whose firm has represented Great Western in New York, and William S. Dugan, an attorney with the New York Attorney General's office. The court has additionally inspected the affidavit of Martin S. Weber, also with the New York Attorney General. The witnesses generally agreed that Strom's firm and in particular Robert Pririe, a member of the firm, initiated contact with the New York Attorney General's office during the week of March 21, 1977, in regard to the proposed tender offer. Strom's firm submitted a memorandum and attempted to secure a ruling from the Attorney General that New York would not assert jurisdiction (over the proposed tender offer) under its takeover law.

On March 23, 1977, Dugan told Pririe that "we were leaning towards a finding of jurisdiction." Transcript of April 8, 1977, (hereafter Tr. I) at 158. On March 24, 1977, Weber conversed with Strom. Weber's affidavit relates the content of his communication to Strom in the exact same terms: they "were leaning toward finding jurisdiction," although they were still investigating. Mr. Strom testified that "Weber said that his office either, I don't remember his exact language, but it had either concluded or believed there was jurisdiction . . ." Tr. I at 23. Dugan testified that as of the date of the April 8, 1977, hearing no official decision had been made by the New York Attorney General to assert jurisdiction. Tr. I at 167. Such an official decision would be implemented by seeking a court order enjoining the tender offer. Tr. I at 171. New York was then proceeding with its investigation. Tr. I at 179.

At the time of the first hearing, the court viewed this evidence as presenting a coherent picture: the New York Attorney General has taken a working position that it had jurisdiction over the tender offer, and it was proceeding in lawyerlike fashion to finish its investigation into the relevant facts and law. It seemed a reasonable inference that Great Western would be enjoined by New York if it attempted to go forward with its takeover. N.Y.Bus.Corp.Law § 1606(a) (1976). Moreover, Great Western would have exposed itself to criminal penalties if its conduct in going forward (after being informed of probable jurisdiction by the New York Attorney General) were deemed willful. N.Y.Bus.Corp.Law § 1607(a).

legedly unconstitutional state statute need not necessarily stem from the threat of immediate enforcement or prosecution; a threat of future enforcement by the state may be sufficient if the state is coercing some present compliance under the statute. *Lake Carriers' Association* *v. MacMullan*, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972) (Michigan did not threaten immediate enforcement of challenged water pollution statute but was forcing plaintiffs to build sewerage storage facilities by threat of future enforcement.)

Under these circumstances, the court did not believe that the threat of action by New York was imaginary or speculative. Its position as to its takeover law was sufficiently adverse to Great Western to constitute a case or controversy,[6] and it was not necessary for Great Western to invite civil or criminal penalties for violating the New York law. *See Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). The court therefore found in its preliminary findings of fact and conclusions of law, entered April 21, 1977, that New York officials had arrived at the working position that they had jurisdiction over the proposed tender offer under the New York takeover law and that a case or controversy existed.

### 3. *Standing as to Maryland*

■ With regard to the third defendant, Maryland, the court concluded on April 21, 1977, that no case or controversy ever existed because Maryland's assertion of jurisdiction over this tender offer was purely speculative. Mr. Polovoy, the Maryland Commissioner of Securities, successfully resisted the blandishments of Great Western to take a position on Maryland's jurisdiction over the proposed tender offer. He testified in his deposition that he was unable to make a determination of jurisdiction from the facts he presently knew, that he had no intention of calling a hearing to investigate further unless someone asked him to do so, and that no one had asked. Polovoy Deposition at 12–14. Although this indecision by Maryland may have caused Great Western some inconvenience and expense—e. g., the necessity for further research or investigation—the court did not believe that Great Western was realistically prevented from going forward vis-a-vis Maryland, especially since Maryland's enforcement procedures for its takeover statute are exclusively civil.

Polovoy Deposition at 6. The court now repeats its conclusion that Maryland has not presently indicated an intention to enforce its statute and that Great Western does not yet suffer an adequate detriment to make a concrete case or controversy against the Maryland statute.

Great Western has proven it has a "case or controversy" with Idaho and New York and has standing to assert claims against these defendants.

### III. Mootness

■ At the hearing of May 23, 1977, after its frustrated attempt to take an uncertified interlocutory appeal in this case, New York representatives introduced in court a no action letter dated May 20, 1977, informing Great Western of the New York Attorney General's determination that the assets of Sunshine were not substantial enough to trigger the New York takeover statute. Although no party to the suit expressed any desire to have the case dismissed against the New York officials, the court raised the issue of mootness, which affects this court's subject matter jurisdiction. *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971).

The doctrine of mootness stems from Article III of the United States Constitution which enables courts to adjudicate "cases and controversies." Federal courts lack jurisdiction to decide questions that do not affect the rights of the litigants before them and are not empowered to decide moot or abstract questions. *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971); *U. S. v. Alaska S.S. Co.*, 253 U.S. 113, 40 S.Ct. 448, 64 L.Ed. 808 (1920).

New York desires to remain in the case to test on appeal its ardently held conviction that its officials may not be subjected to suit in another state on the basis of official

---

**6.** While the most convincing demonstration of concrete injury under a regulatory statute is the repetitive enforcement of sanctions, e. g., *Armour v. Ball*, 468 F.2d 76 (6th Cir. 1972), such a requirement in the context of tender offers would effectively remove the declaratory judgment as a remedy. The court views *Lake*

*Carrier's Association v. Michigan, supra*, as indicative that a court may consider economic pressures upon a business, induced by the likelihood of future enforcement of sanctions, in judging the effectiveness in fact of a statutory obligation.

actions. But New York's desire to vindicate itself on appeal is not sufficient to preserve a case or controversy.

Great Western has also insisted that the case is not moot as to New York. Although it is apparent that no relief against New York is necessary for Great Western to make its proposed tender offer, Great Western urges that the "voluntary cessation of allegedly illegal conduct does not . . . make the case moot." *United States v. W. T. Grant*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). *Grant*, however, was a *public* challenge to discontinued action. The Court was further satisfied that there existed "some cognizable danger of recurrent violation, something more than the mere possibility which keeps the case alive." *Id.* at 633, 73 S.Ct. at 898, 97 L.Ed. at 1309. As Professor Wright observes, however, a private plaintiff, such as Great Western, must make a more particularized showing of future impact:

> Private plaintiffs challenging discontinued official or private action, however, must show more than the possibility of recurrence. In addition, there must be shown some level of probability that recurrence will affect the individual plaintiff . . . . Many state courts are willing to decide issues of public interest that are expected to recur, and to pose continuing difficulties of repeated mootness, without regard to the probable impact on the immediate plaintiff. The Supreme Court, however, has explicitly refused to apply this doctrine . . .

Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3533 at 285. As Professor Wright also suggests, this requirement may be diluted when there is a future impact on interests which the plaintiff is in effect given standing to represent, i. e., public interest cases such as abortion and election suits. *Id.* at 289.

While the instant case may involve issues important to many investors and corporations, the court does not believe that it falls into the pattern of public interest cases about which Professor Wright is speaking. Great Western, as a private litigant, has not made the required showing that it will again be injured by enforcement of the New York law. Nor can Great Western accurately characterize the actions of the New York officials as "capable of repetition, yet avoiding review" so as to avoid the requirement of a projected future effect upon itself. It is true that the few hostile tender offerors in recent years affected by these state takeover laws have chosen to comply as a tactical matter. It is generally quicker to comply than to litigate, and time is of the essence in tender offers. However, with the recent proliferation of state takeover laws,[7] it is reasonable expectation that more companies will come to the conclusion of Great Western that the possible conflicts and confusion of complying with multiple state takeover laws are intolerable. The court has no doubt that the New York law will be challenged in the future under appropriate circumstances. For these reasons, the court lacks jurisdiction to adjudicate the case against New York due to mootness and it should be dismissed.

## IV. Subject Matter Jurisdiction

Great Western has sought subject matter jurisdiction on four bases: 28 U.S.C. § 1331 (general federal question), 28 U.S.C. § 1332 (diversity), 28 U.S.C. § 1337 (acts regulating commerce), and 15 U.S.C. §§ 78aa (The Securities Exchange Act of 1934). The parties have stipulated that the amount in controversy exceeds $10,000.

In the opinion of the court, subject matter jurisdiction exists under 28 U.S.C. §§ 1331[8] and 1332. The court is further of

---

7. As recently as 1974, only five states had takeover laws: Minnesota, Nevada, Ohio, Virginia and Wisconsin. Today twenty-eight states have such laws.

8. It has long been held that a suit "arises under" the Constitution if the petitioner's claim "will be sustained if the Constitution . . .

[is] given one construction and will be defeated if [it is] given another."
*Powell v. McCormack*, 395 U.S. 486, 514, 89 S.Ct. 1944, 1960, 23 L.Ed.2d 491 (1969). The instant case turns on construction of Article I, § 8 (the Commerce Clause) and Article VI, cl. 2

the opinion that a suit challenging state legislation as preempted by the Securities Exchange Act of 1934 arises under Acts of Congress regulating commerce. Jurisdiction also lies under 28 U.S.C. § 1337.

The Securities Exchange Act of 1934 § 27, 15 U.S.C. §§ 78aa [hereinafter 1934 Act] grants the federal courts "exclusive jurisdiction of the violations of this title or rules and regulations thereunder and of all suits in equity and actions at law brought to enforce any liability or duty created by this title or the rules and regulations thereunder."

In the opinion of the court, a suit for declaratory judgment against a statute preempted by the Williams Act, which is codified under the 1934 Act at 15 U.S.C. §§ 78m(b)–(e), 78m(d)–(f), falls within the broad ambit of this jurisdictional language: "all suits in equity or actions at law." The general breadth of the subject matter jurisdiction, personal jurisdiction, and venue conferred by § 27 indicates a Congressional intent to facilitate the litigation of any claim arising under the 1934 Act in federal court. Jurisdiction of a cause of action claiming preemption of a state law by virtue of the 1934 Act is especially appropriate since § 28(a) of the Act, 15 U.S.C. § 78bb(a), specifically addresses preemption of state law.[9] This section creates an express "duty" on states and state officers to abstain from enforcement of state securities laws to the extent they are preempted. Therefore, Great Western has properly alleged subject matter jurisdiction under §§ 1331, 1332, 1337 and 27.

### V. Sovereign Immunity

■ Defendants contend they are immune from suit due to the doctrine of sovereign immunity. Sovereign immunity is based on the old common law concept that a sovereign cannot be sued without its consent. The Eleventh Amendment provides

that a state is not suable in a federal court "by citizens of another state." Though hoary, the doctrine is still viable. *Edelman v. Jordan*, 415 U.S. 651, 678, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). However, in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the United States Supreme Court held that a citizen may sue a state official to enjoin operation of an allegedly unconstitutional state statute, a decision that opened the floodgates to constitutional litigation. Perhaps the Idaho defendant truly considers *Ex parte Young, supra,* "an anomaly in the law." Idaho Brief for Jurisdiction and Venue Hearing at 40. In the opinion of the court, *Ex parte Young* is one of the pillars of our post-Civil War federal system and is firmly ensconced in our jurisprudence. Its application to prospective relief against state officials such as is sought in this case is to date unquestioned. See *Edelman v. Jordan*, 415 U.S. at 664, 667–8, 94 S.Ct. 1347, 39 L.Ed. 662. Sovereign immunity is no bar to a suit seeking declaratory and injunctive relief against state officials to prevent their prospective enforcement of an allegedly unconstitutional state law.

### VI. Personal Jurisdiction

The Court has subject matter jurisdiction over this case on four bases: 28 U.S.C. § 1331 (general federal question), 28 U.S.C. § 1332 (diversity), 28 U.S.C. § 1337 (acts affecting commerce) and Section 27 of the 1934 Act. The court must now examine each subject matter cause of action to determine whether personal jurisdiction exists against the State of Idaho.

### A. *Diversity Jurisdiction*

■ In diversity cases brought under 28 U.S.C. § 1332 the federal court sits as a state court and state law of personal jurisdiction controls. *Arrowsmith v. United Press Intl.*, 320 F.2d 219 (2nd Cir. 1963). Texas art. 2031b, Tex.Rev.Civ.Stat., pro-

---

(the Supremacy Clause) of the United States Constitution.

**9.** "Nothing in this chapter shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of

any State over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder."

vides for personal jurisdiction over non-residents. The scope of personal jurisdiction exercised by the State of Texas is contiguous with maximum constitutional limits of jurisdiction. *Product Promotions v. Jacques Cousteau*, 495 F.2d 483, 491–2 (5th Cir. 1974); *Hoppenfeld v. Crook*, 498 S.W.2d 52, 56 (Tex.Civ.App.—Austin 1973, writ ref'd, n. r. e.). There are two tests used to determine if jurisdiction exists. In order for a nonresident to be amenable to suit pursuant to art. 2031b there must be, first, "minimum contact with [Texas] which results from an affirmative act of the defendant" and "it must be fair and reasonable to require the defendant to come into the state and defend the action." *Product Promotion v. Jacques Cousteau*, 495 F.2d at 494.

### 1. *The "Minimum Contacts" Test*

■ The state of Idaho clearly has "minimum" contacts with Texas. The Idaho takeover statute prohibits Great Western from making *any* tender offer until Idaho law has been complied with. Idaho Code § 30–1501 et seq. This proscription affects Texas shareholders who might wish to sell their shares of stock.

Idaho has urged strongly that almost any state legislative or regulatory action in the commercial sphere effects predictable consequences outside the state and that more contact should be required than this minimum contact. For example, enforcement of Idaho blue sky law, regulating the offer or sale of securities by a Texas corporation in Idaho, would certainly have an impact in Texas. If the corporation were for some reason unable to comply with Idaho blue sky requirements, its inability to raise capital might cause Texas residents to lose their jobs. If the Idaho legislature passed new and onerous pollution controls on facilities owned by a Texas corporation in Idaho, Texas shareholders would be adversely affected. Subjecting state officials to suit in another state on the basis of out-of-state ripple effects from traditional, internal activities would be disruptive of federal relations.

But the court sees a qualitative difference in activities which concern primarily the internal commercial affairs of Idaho and incidentally affect out-of-state interests and the type of affirmative regulation of commercial affairs of non-residents attempted by the takeover act in question, Idaho Code § 30–1506. The court knows of no real analogy to this type of extraterritorial interference.

The Idaho takeover laws are not an exercise of the state's power to regulate the internal affairs of a corporation whose legal existence is derived from state power.[10] Sunshine is a Washington corporation which has triggered the Idaho takeover law because its principal office is located in Idaho and it has substantial assets in Idaho. Idaho Code § 13–1501(6).

Nor are state takeover laws analogous to state blue sky laws which protect state residents from fraudulent acts committed within state borders. Idaho has not merely told Great Western that it may not make a tender offer within Idaho—it has ordered Great Western to refrain from soliciting publicly traded securities anywhere. Idaho representatives have justified this extraterritorial aspect of the Idaho takeover law as necessary to protect the relative position of Idaho shareholders vis-a-vis shareholders of other states.[11] TRO tr. at 26. It is as if, to expand upon a previous example, Idaho enjoined corporations somehow subject to its jurisdiction from offering securities in any state unless they first complied with Idaho blue sky registration requirements. Idaho of course would not want its citizens deprived of advantageous investment opportunities if such corporation were inclined to omit Idaho from their offerings because of onerous blue sky requirements.

---

10. For other arguments that tender offers do not affect existing intracorporate relationships and thus involve the internal affairs of a corporation, see Comment, Commerce Clause Limitations upon State Regulation of Tender Offers, 47 So.Cal.L.Rev. 1133, 1153–7 (1974).

11. If there were no Idaho shareholders of Sunshine, Idaho could still apply its takeover law out of paternal concern for the shareholders of sister states. TR. I at 225.

### 2. The "Fair and Reasonable" Test

The second requirement for personal jurisdiction is that it be "fair and reasonable" to require Idaho to defend a suit in Texas.

The court does not consider it fair and reasonable to subject state officials to suit in another jurisdiction because of extraterritorial ripple effects resulting from internal state actions. However, it does not offend this court's sense of fundamental fairness to make Idaho officials defend in whatever forum they attempt to affirmatively regulate commercial affairs of non-residents, whether this extraterritorial regulation is valid or invalid. Personal jurisdiction exists against officials of the State of Idaho pursuant to art. 2031b insofar as Great Western's diversity cause of action.

### B. Federal Question Jurisdiction

Sections 1332 and 1337 of Title 28 do not contain any provisions for maintenance of personal jurisdiction. Section 27 of the 1934 Act provides that an action "may be brought" in the district "wherein any act or transaction constituting the violation occurred" or in which "the defendant is found or is an inhabitant or transacts business." This language in Section 27 sounds more like a venue provision rather than one providing personal jurisdiction and has been so construed. *Oxford First Corp. v. PNC Liquidating Corp.*, 372 F.Supp. 191 (E.D.Penn.1974). Thus none of the federal question causes of action contains statutes providing for personal jurisdiction. When suits are brought in federal court on a federally created right without such a provision general federal law and concepts of due process determine whether a defendant is subject to the court's jurisdiction. Wright & Miller, Federal Practice and Procedure: Civil § 1075 (1969).

There is some difference of opinion among jurists and legal writers as to what standards are to be applied to determine if personal jurisdiction exists. Historically, the concept of personal jurisdiction is founded on the antiquated concept of Anglo-American law that a sovereign may exercise personal jurisdiction within its territorial limits. This principle has been recognized as to the United States itself in suits based on federally created rights. *Oxford First Corp. v. PNC Liquidating Corp.*, 372 F.Supp. 191, 198–200 (E.D.Penn.1974). Some writers have opined that personal jurisdiction exists against defendants anywhere in the United States [12] on a federally created cause of action without the necessity of any demonstration of the "minimum contacts" articulated in *International Shoe v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny, which set forth limitations on the exercise of extraterritorial jurisdiction by states beyond their territorial limits. In contrast, on federally created causes of action no attempt is made to assert extraterritorial jurisdiction since federal jurisdiction exists in all states. *Stern v. Gobeloff*, 332 F.Supp. 909 (D.Md. 1971); *First Flight Co. v. National Carloading Co.*, 209 F.Supp. 730 (E.D.Tenn.1962).

Most writers, however, have assumed some limits upon federal personal jurisdiction. Some have adopted *International Shoe* criteria, while others have held that the Fifth Amendment due process clause imposes constitutional limits. In *Oxford First Corp. v. PNL Liquidating Corp.*, 372 F.Supp. at 203 (E.D.Penn.1974), the court applied a five-prong federal "fairness" test, of which one consideration was the *International Shoe* "contacts." [13]

This court is of the opinion that the Fifth Amendment places some fairness limitations upon the power of the United States to require a defendant found within the territorial limits of the United States to be tried in some areas of the country. How-

---

12. Safeguards exist other than limits on personal jurisdiction. Once jurisdiction is found venue and service of process provisions must also be met to submit a defendant to jurisdiction in a district.

13. The court also considered matters which would be considered under 28 U.S.C. § 1404, such as inconvenience to the defendant in the forum, the matter of judicial economy, the site of discovery and the extent of impact of the regulated activity in question that the defendant's actions have beyond its borders.

ever the court holds that the assertion of personal jurisdiction over the Idaho defendants pursuant to §§ 1331, 1337 and 27 does not impose any undue hardship upon the defendants or violate any fairness constraints on the federal judicial power under the circumstances of this case. These defendants have, to advance the interests of Idaho citizens and/or Sunshine, a corporation with Idaho ties, enjoined Great Western, a Texas based corporation, from purchasing shares of Sunshine from citizens of every state, including at least 489 Texas residents. Idaho officials give their takeover statute this extraterritorial effect by forbidding tender offerors subject to their jurisdiction from making any offer to citizens of another state which is not also made to citizens of Idaho. Idaho Code § 30–1506.

The court is not impressed with the Idaho defendants' legalistic suggestion that as state officials they can only enforce their takeover laws through personal jurisdiction over Great Western within their territorial borders, that thus they have no presence outside their borders, and that it is therefore unfair to make them defend in Texas. TRO tr. 44,116. The practical effect of the Idaho defendants' actions is to regulate business activities of Great Western and the investment opportunities of shareholders of Sunshine in Texas and every other state.[14] The court does not therefore find it unfair to make the Idaho defendants appear where the predictable consequences of their purposeful actions are felt. Personal jurisdiction exists against the Idaho defendants on the causes of action brought under Sections 1331, 1337 and 27.

## VII. Venue

It has been determined that personal jurisdiction exists against the Idaho defendants. The next inquiry is whether venue is proper in this district.

### A. *Venue of Federal Question Cases*

■ Section 1391(b) of Title 28, United States Code, provides that a civil action in which jurisdiction is not founded solely on diversity of citizenship may be brought in the judicial district "where all defendants reside, or in which the claim arose, except as otherwise provided by law." Sections 1331, 1332 and 1337 of Title 28 do not contain venue provisions and causes of action based on these sections may only be brought in the Northern District of Texas if venue lies under one of the two venue provisions contained in § 1391(b).

The Idaho defendants clearly do not "reside" within the Northern District of Texas and venue cannot rest on the residence of defendants. Nor did the claim arise in this district. A claim is deemed to arise only in one place for § 1391 venue purposes. Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3806 at 28–29 (1976). In determining where a claim arises, courts should use a weight of contacts test and determine the district where the contacts are most significant. *Grappone, Inc. v. Subaru of America, Inc.*, 403 F.Supp. 123 (D.C.N.H.1975); *Ghazoul v. International Management Services, Inc.*, 398 F.Supp. 307 (D.C.N.Y.1975).

It can be argued that the Idaho defendants injured Great Western in the Northern District of Texas, but any such argument applies equally to all other federal judicial districts. It is clear that Great Western's claim arises in Idaho, the source of the power extraterritorially asserted.

Therefore, venue in this district does not lie on Great Western's causes of action based on §§ 1331, 1332 and 1337.

### B. *Venue Under the 1934 Act*

Unlike §§ 1331, 1332 and 1337, § 27 of the 1934 Act contains a venue provision and allows an action thereunder to be brought "in any district . . . wherein any act or transaction constituting the violation oc-

---

14. Although, as Idaho itself suggested at trial on the merits, its extraterritorial regulation may be void, its state officials have previously taken the contrary position. TRO tr. at 116.

No prudent businessman is going to make the offer outside of Idaho and await the state's view on whether he should spend up to three years in prison. Idaho Code § 30–1510.

curred or in the district wherein the defendant . . . transacts business . . ." The 1934 Act is intended as a broad, remedial statute and the plain intent of Congress was to provide the most potent venue provisions possible.

The acts giving rise to violation of Idaho's alleged preempted takeover statute occur wherever the statute is being enforced, i. e. all states in which Sunshine shareholders reside. If this result seems remarkable it is because Idaho's regulation of securities transactions outside its borders is equally remarkable. By enforcing this statute against Great Western and Texas shareholders of Sunshine, the Idaho defendants have committed acts in Texas which constitute an integral part of their allegedly unconstitutional enforcement of the Idaho takeover law. See *British Amer. Ins. Co., Ltd. v. Lee*, 403 F.Supp. 31, 33–34 (D.Del. 1975). The control exerted by the Idaho defendants in Texas is an economic and legal reality unfettered by any theoretical territorial limits upon Idaho's jurisdiction.

Venue lies in this district against the Idaho defendants on the cause of action based on § 27 of the 1934 Act. Pendent in personam jurisdiction and venue exist to consider Great Western's claim that enforcement of the Idaho takeover statute unconstitutionally burdens commerce. *Oxford First Corp. v. PNL Liquidating Corp.*, 372 F.Supp. 191, 196 n. 15 (E.D.Penn.1974).

### VIII. Service of Process

█ Rule 4 of the Federal Rules of Civil Procedure governs process in federal courts. Rule 4(d) governs service of process on defendants within the state in which the federal district court is located, while Rule 4(e) governs service on a defendant outside that state. Rule 4(e) provides the only means of accomplishing service on the Idaho defendants.

Rule 4(e) provides "whenever a statute of the United States . . . provides for service of a summons . . . upon a party not an inhabitant of or found within the state, service shall be made under the circumstances and in the manner prescribed by the statute, rule or order." Section 27 of the 1934 Act provides for worldwide service of process "wherever the defendant may be found." Service is proper on the Idaho officials within that statute.

The Texas Long Arm Statute, art. 2031b, Tex.Rev.Civ.Stat., provides an alternate method of service. It may, of course, be used in cases exclusively within federal question jurisdiction, as well as within diversity jurisdiction. Wright & Miller, Federal Practice and Procedure: Civil § 1075 at 313 (1969). Utilization of art. 2031b carries with it any Texas limitation on personal jurisdiction since Rule 4(e) allows service pursuant to a statute "under the circumstances" allowed by the statute. Service under art. 2031b incorporates Texas standards of amenability to suit which, as discussed above, render the Idaho defendants liable to suit herein. Service of process is also proper under the Texas Long Arm Statute.

Having found that jurisdiction, venue and service of process are proper against Idaho defendants the Court has at last charted its way to the merits of this action. Great Western challenges the validity of the Idaho takeover statute on two grounds. First, Great Western claims that Congress has preempted the Idaho takeover statute pursuant to the Supremacy Clause, Article VI, Clause 2 of the United States Constitution; and second, Great Western claims that the Idaho takeover statute violates the Commerce Clause, Article 1, Section 8, of the United States Constitution.

### IX. Doctrine of Preemption

Article VI, Clause 2 of the United States Constitution provides in relevant part:

"This Constitution, and the Laws of the United States . . . shall be the Supreme Law of the Land."

In order to effect the Supremacy Clause, the courts have developed the doctrine of federal preemption. The doctrine renders state laws invalid if their effect is to create an "obstacle to the accomplishment and ex-

ecution of the full purposes and objectives of Congress." [15]

An analysis of preemption decisions leads this court to the conclusion that this area is imbued with result-oriented decisions which tend to comport with the philosophical leanings of the Supreme Court. This court discerns several tests which have been applied for the Supreme Court to determine whether a state statute is preempted by a federal statute. Applicability of any one of these tests will render the Idaho takeover statute preempted by the Williams Act.

■ First, a state statute is preempted if it is apparent from federal statutes, their legislative histories, or the pervasiveness of the federal regulatory scheme that Congress intended to occupy the field and displace state regulations. Second, a state statute is preempted if it affects a field in which the federal interest is so dominant as to preclude state laws regulating the same subject. Finally, a state statute is preempted if it conflicts with the federal law to such an extent as to be an obstacle to the accomplishment of the federal scheme.

### A. *Congressional Occupation of the Field*

■ Congressional intent to fully occupy a field may be expressly stated or may be circumstantially inferred. In *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1946), Justice Douglas listed various inferential approaches to Congressional occupation of a field:

> The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. . . . Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. . . . Likewise, the object sought to be obtained by the

federal law and the character of the obligations imposed by it may reveal the same purpose. . . .

Despite the many persuasive arguments about the pervasiveness of federal securities regulation, the need for national uniformity in this area, and the dominant federal interest therein, one impassable obstacle looms across this road to preemption. Great Western states in its brief: "For over forty years Congress has occupied the field of regulation of the securities markets." Plaintiff's Supplemental Memorandum (5/20/77) at 25. For this same period of time federal securities laws have coexisted with state securities laws.[16] Such coexistence would be impossible if Congress has occupied the field. Great Western can analogize to areas in which Congress has occupied the field, e. g., aviation, but it can point to no precedents consistently driving the states out of the field of securities regulation such as exist in the area of aviation. There is no way around the fact that state and federal securities laws presently coexist to some extent. The Williams Act does not occupy the field of tender offer legislation.

### B. *Dominance of Federal Interest*

■ Nor is the federal interest in the securities market so dominant as to preempt state securities legislation. Federal control of the securities field is not "intensive and exclusive" as is federal control over aviation. States have a valid interest in regulation of securities sold within their borders and state statutes have existed regulating this area for some time. The dominance of the federal interest in securities does not preempt state statutes.

### C. *Conflict Between the State and Federal Schemes*

■ A state statute may also be preempted by a federal law if it is in conflict

---

**15.** *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

**16.** "Of course, under securities laws state regulation may coexist with that offered under the

federal securities laws." *SEC v. National Securities*, 393 U.S. 453, 461, 89 S.Ct. 564, 569, 21 L.Ed.2d 668 (1969).

with the federal law. A brief history of the Williams Act is helpful in this regard.

Congress did not concern itself with the federal regulation of cash tender offers until the 1960s, when the use of the cash tender offer had become popular due to its advantages over use of full-blown proxy contests. In 1965, Senator Harrison Williams introduced the first legislative proposals for regulation of tender offers. Senator Williams' first bill would have required any person making an offer to file certain information with the target company and with the Securities and Exchange Commission (SEC) twenty days in advance of the offer to shareholders. This approach was criticized by the SEC and Senator Williams subsequently introduced a bill following the SEC's recommendation that a confidential statement be filed with the SEC five days before the offer was made to shareholders. This version of the bill met objection from members of Congress and the New York and American Stock Exchanges.

An enacted in 1968, the Williams Act contained no requirement whatsoever that an offeror make disclosure to a government agency in advance of the offer to shareholders. The Act requires disclosure of a minimal amount of information which would generally be necessary for an investor to make a reasonable decision whether to tender his shares, including the identity of persons on whose behalf purchases are to be effected, the source and amount of funds of the offeror, any plans of the offeror to liquidate, sell or merge the target company, the number of shares owned by the offeror and any contracts between the offeror and the target company. 15 U.S.C. § 78m(d)(1).

The legislative history of the bill makes it clear that the Williams Act was not designed to obstruct legitimate takeover bids, but to "balance the scales equally to protect the legitimate interests of the corporation, management, and shareholders without unduly impeding cash takeover bids." 113 Cong.Rec. 854 (1967). After the Williams Act was passed, many states began enacting statutes regulating the making of tender offers of target companies having nexus in their states. The state takeover statutes base their jurisdiction on one of several connections with the State. The Idaho statute under consideration purports to regulate the tender of stock of any target company which is an Idaho corporation, has its principal office in Idaho or has "substantial assets" located in Idaho. Idaho Code § 30–1501(6).

Substantively, the Idaho statute differs significantly from the requirements of the Williams Act. First, while the Idaho statute requires the offeror to provide information required by the Williams Act it also requires other more detailed information. Some of the information, such as a description of business done by the offeror and material changes therein in the prior three years, seems only collaterally related to that information that a shareholder would require in deciding whether or not to tender his stock.

Second, while the Williams Act has no waiting period after filing the applicable information before an offer may be made, the Idaho act requires that a registration statement be declared effective by the Director of the Department of Finance before the offer can commence. Further, the management of the target company can demand a hearing which the State of Idaho is required to provide within twenty (20) days after the date of filing. A decision must be made within thirty (30) days after the hearing, but this time period may be extended. If a hearing is called the offer shall not become effective until registered by order of the Director of the Department of Finance. Idaho Code § 30–1504. Thus the management of the target company can unquestionably delay the institution of a tender offer for several weeks in which to marshal its resources.

Third, while the Williams Act requires the offeror to file the required information with the SEC under all circumstances, the Idaho Act does not require compliance with Idaho law if the target company's board of directors recommends acceptance of the tender to its shareholders. Idaho Code § 30–1501(5)(e).

It is clear that the Idaho statute conflicts with and frustrates the clear purposes of the Williams Act. The State of Idaho strongly maintains that a conflict exists rendering preemption applicable only if the state statute renders it impossible to comply with the federal standards. But a conflict may also exist when the state statute frustrates a Congressional purpose. Wilner and Landy, *The Tender Trap: State Takeover Statutes and Their Constitutionality,* 45 Fordham L.Rev. 1, 23 (1976). The court is of the opinion that absolute impossibility of compliance with both laws is not necessary to a finding of preemption. Indeed, in *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 145, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), the converse is indicated: If impossibility of compliance does not exist, then further inquiry is necessary.

This court is of the opinion that the Idaho statute conflicts with the Williams Act by destroying the careful balance struck in the Williams Act between the offeror and the management of the target company designed to protect the interests of the shareholders. It is clear from examination of the legislative history and the Act itself that Congress' purpose in enacting the Williams Act was to let tender offers go forward for the benefit of shareholders. It is equally clear that the purpose of the Idaho takeover statute is to inhibit tender offers for the benefit of management.[17] This purpose is evident from several provisions of the Idaho statute discussed above. By providing that a hearing must be held for the protection of the Idaho shareholders if "requested by the target company acting through its Board of Directors," the Idaho statute gives management an absolute right to an administrative hearing prior to the time any tender may be made. If Idaho had the public interest in mind, any advance administrative review would be vested in a state agency which could hold hearings when necessary. The Idaho statute supplies management of the target company with a delay mechanism for use at its discretion. In contrast, the Williams Act provides for no administrative review prior to the time a tender is made.

Further, the Idaho statute provides for an exemption from compliance with the terms of the Idaho statute if the Board of Directors of the target company recommends its acceptance to the stockholders. In contrast, the Williams Act requires compliance with its terms in the case of all tender offers, thus indicating its interest in protection of the shareholders rather than the management.

The Idaho statute thus places the tools of delay—anathema to an offeror—within and only within the reach of management. And the statute blithely removes all impediments of an offer if management approves. There is a conflict of purpose between the Williams Act and the Idaho statute: the Williams Act regulates the making of tender offers for the benefit of shareholders, while the Idaho statute regulates the making of tender offers primarily for the benefit of the management of the target company. By weighing the scales so heavily in favor of management of target companies, the Idaho statute has destroyed the delicate balance reached by the Williams Act. Because of the conflict that exists, this court is of the opinion that the Idaho takeover statute is preempted by the Williams Act.

### X. The Commerce Clause

■ Article I, Section 8 of the United States Constitution gives Congress the power "to regulate Commerce . . . among the several states" in order to prevent unjustifiable local restraints from interference with commercial intercourse among the states. Not every state statute regulating commerce is unconstitutional, of course. In *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), the Supreme Court stated the criteria for determining whether or not a state statute regulating commerce was constitutional:

---

**17.** Courts may examine unstated purposes of state statutes when evaluating their validity. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 144–

45, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); *Foster-Fountain Packing Co. v. Haydel,* 278 U.S. 1, 10, 49 S.Ct. 1, 73 L.Ed. 147 (1928).

Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.

In order to be valid, a state statute regulating commerce must, first, effectuate a legitimate local public interest; second, affect interstate commerce only incidentally and; third, if the first two tests are met, meet a balancing test applied to determine whether or not the burden imposed on commerce is excessive in relationship to the alleged local benefits provided by the statute.

### A. Legitimate Local Interest

■ A state statute regulating interstate commerce must first achieve a legitimate local public interest. An examination of the Idaho statute compels this Court to the conclusion that it is neither legitimate nor local in its application.

The primary purpose generally articulated for passage of state takeover laws has been the protection of shareholders of corporations which are incorporated in or have significant connections with the controlling state. In determining whether a state statute effects its articulated purpose a court examines the practical effects of the legislation rather than any statement of purpose contained in the law itself or its legislative history. Foster-Fountain Packing Co. v. Haydel, 278 U.S. 1, 10, 49 S.Ct. 1, 73 L.Ed. 147 (1928).

In any tender offer, there are at least three interested parties who have conflicting interests to some extent: the offeror, the shareholders and the management of the target company. The Williams Act seeks to protect the shareholders and to balance the competing interests of the other two parties. Despite the Idaho defendants' contention that the Idaho statute protects the interest of shareholders, this court finds that the immediate purpose of the statute is to protect incumbent management.

The presence of the Idaho statute might work to the detriment of shareholders in several ways. First, the statute enables management of an unwilling target company to delay and frustrate the making of the offer by invoking the administrative procedure of the takeover statute. Second, the presence of the statute might dissuade a potential offeror from making an offer where it is faced with one or more onerous state take over statutes.

Third, there was evidence presented that the presence of the statute might discourage an offeror from initially announcing its top offer. In some such cases the offeror holds the top offer back from shareholders and discloses it to target company management only in hopes of obtaining management's approval of the offer. By obtaining such approval the offeror negates the necessity of complying with the takeover statute. In those cases where a friendly arrangement cannot be consummated, the shareholders might never have an opportunity to consider and accept the higher offer made only to management. Fourth, the presence of the statute might induce the offeror to reduce its originally announced offer price where it encounters resistance resulting from management's utilizing delays permitted by the takeover statute. In such case shareholders could also be deprived of the opportunity to consider and accept the original and higher offer.

The ultimate purpose of the Idaho statute is to thwart tender offers and thereby prevent possible removal of the target company or its management, the closing of plants and related effects on the state's economy. But a state may not legitimate its regulation of interstate commerce by asserting this type of interest. As stated by the Supreme Court in Hood & Sons v. Du Mond, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949), a statute may not be enacted "solely for protection of local economic interests."

Nor does the Idaho statute have only local application. The terms of the statute apply not only to the corporations incorporated under the statutes of Idaho, having their main office in Idaho or having "sub-

stantial assets in Idaho," they also affect shareholders domiciled outside the state. The Idaho statute provides that tender offers may not be made to non-Idaho shareholders without being made to Idaho shareholders also. Idaho Code § 30–1506. The Idaho statute thus undertakes to regulate the offeror's affairs not only within Idaho, but within all states in which the offeror might make a tender offer. This intended extraterritorial effect distinguishes the takeover statute from state Blue Sky laws, which clearly do not intend to govern regulation of securities outside state boundaries.

Idaho has shown no legitimate local interests in protection of shareholders in other states. In short, the Idaho defendants have not demonstrated that the state takeover statute regulates a legitimate local interest.

### B. *Effect on Interstate Commerce*

The second of the *Pike* criteria inquires whether the burden of the local law affects interstate commerce incidentally or significantly. It is clear that the Idaho takeover law purposefully precludes Great Western's making a tender offer anywhere until the provisions of the Idaho statute have been met. The Idaho takeover statute has a substantial effect on interstate commerce.

### C. *The Balancing Test: Interstate Burden vs. State Benefit*

Having failed the first two *Pike* criteria, it is not necessary for the court to apply the balancing test. Assuming arguendo that it is necessary to do so the court makes the following findings.

The testimony at the trial of this case indicated that there may well be some benefits to shareholders by a waiting period prior to making of a tender offer. The evidence indicated that once an announcement of a tender is made, the value of shareholders' stock tends to rise. In some cases, the offeror must raise its tender price as the value of the shares rises due to the initial tender. In other cases the management of the target company might make a tender for shares of its stock also in excess of the market value. But the provisions of the Idaho statute do not guarantee these possible benefits to shareholders will actually take place. If management is satisfied with a tender offer, the Idaho statute never even comes into play to delay the offer. Thus any benefits that would be derived to the shareholders by the terms of the Idaho statute are by no means assured.

Weighed against this contingent benefit to shareholders is the burden that the Idaho statute places on interstate commerce. Evidence at trial showed that takeover statutes have a tendency to discourage offerors from making tender offers and that the very presence of state takeover statutes might eliminate the possibility of a tender offer being made. Further, compliance by an offeror with one state statute interferes with commerce; compliance with many state statutes (as in a tender for a large target company) would unquestionably have a deleterious effect on interstate commerce.

Even after compliance with the takeover statutes, their provisions would have several other effects on interstate commerce. First, evidence showed that the takeover statutes encourage offerors to make lower offers than would have been made without the statute. Second, the waiting and announcement period of the Idaho statute might well have a disruptive effect on the stock of the target company, perhaps to the extent that there would be little market for the stock while the waiting periods were complied with. Finally, the waiting periods would permit management of a target company to delay the tender offer for varying periods during which time they could merge with another company, appeal to the shareholders not to sell their shares, make long term management contracts with target company personnel, or attempt to purchase the shares themselves. The Idaho statute violates the Commerce Clause and the Idaho defendants should be enjoined from enforcing the statute.

### XI. Conclusion

The legislative history and contents of the Williams Act lead this Court to con-

**440**

clude that Congress intended to regulate the making of cash tender offers. The Idaho takeover statute, Idaho Code §§ 30–1501 to –1513 (Supp.1975), effectively destroys the Congressional plan for the making of such tender offers and is therefore preempted by the Williams Act. Further, the Idaho takeover statute does not fulfill a legitimate local interest but, to the contrary, has a pervasive effect on interstate commerce that violates the Commerce Clause of the United States Constitution. The relief sought by Great Western for a declaratory judgment and injunctive relief against the Idaho defendants should be granted.

The parties will submit a Judgment in accordance with this Opinion.